# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION


JOEL P. MOYER, et al.,

        Plaintiffs,

    v.                         C-1- 01-140

PEOPLE TO PEOPLE
INTERNATIONAL, INC., et al.,

        Defendants.


## ORDER

This matter is before the Court upon plaintiffs' motion for partial summary judgment

(doc. 81) and a motion for summary judgment filed by defendants People to People

International, Inc. and Ambassador Programs, Inc. (doc. 84). The parties have submitted

proposed findings of fact and conclusions of law highlighted by the opposing party (docs. 94, 96,

97, 98). Plaintiff has requested oral argument on defendants' summary judgment motion.

### I. Procedural history

Plaintiffs bring this action against defendants People to People International, Inc. (People

to People), Ambassador Programs, Inc. (Ambassador), and Humana/ChoiceCare (Humana).[1]

Jurisdiction is premised on 28 U.S.C. § 1332.

---

[1] Plaintiff also originally named E.I.L., Ltd (E.I.L.) as a defendant. The Court dismissed
E.I.L. from the lawsuit based on a lack of personal jurisdiction.

## II. Undisputed facts

The undisputed facts are as follows:

1.   Plaintiffs Joel P. Moyer and his parents, David M. Moyer and Marcia G. Moyer, are residents of Ohio.

2.   Joel was born on September 7, 1982. He is presently a student at Indiana University, where he has earned excellent grades.

3.   David Moyer is a practicing attorney. Marcia Boyer is a bookkeeper for various clients. She has a bachelor's degree in psychology.

4.   People to People is a non-profit corporation that was established by President Dwight D. Eisenhower. The corporation fosters international understanding, in part through educational travel programs for American students. People to People is based in Kansas City and has one-person satellite offices in Boston and Berlin.

5.   Ambassador is a for-profit corporation based in Spokane, Washington. Ambassador puts together overseas travel programs under various names.

6.   People to People contracts with Ambassador. Ambassador is licensed by People to People to organize trips under the trade name "People to People Student Ambassador Program" (Program). The Program is a People to People program which is operated by Ambassador. The Program is designed to educate American students about foreign cultures by providing students with the opportunity to travel to foreign countries and interact with foreign nationals.

7.    Part of the Program involves homestays, a term for trip participants' stays at homes of foreign nationals. Through homestays, participants can learn more about foreign cultures than by merely staying in commercial lodging.

8.    In the fall of 1998, Joel received a letter from a teacher at his high school about the Program. Joel and his mother attended an information meeting where Ambassador's Diane Moore-Critchlow spoke. She talked about the Program and the upcoming 1999 United Kingdom trip. After the meeting, Joel and his parents signed and read Ambassador's Application and Conditions of Program. Joel was sixteen years old when he applied to participate in the Program and at the time of the 1999 trip.

9.    Over the next few months, Joel and/or his parents attended periodic meetings about the trip. Trip participants were given materials about the trip and the places they would visit. The participants, including Joel, were specifically instructed not to drink any alcoholic beverages, even if they were legally old enough to drink in the foreign countries. Joel also signed a written contract with Ambassador pursuant to which he promised not to drink alcohol during the trip.

10.    Ambassador has never made the actual arrangements for homestays on its United Kingdom trips.

11.   E.I.L. is a European non-profit educational exchange organization that, among other things, investigates and selects homestay hosts. Ambassador contracted with E.I.L. to arrange homestays and supply travel services on the July 1999 United Kingdom Program trip.

12.   There was no signed contract between Ambassador and E.I.L. Rather, Ambassador provided E.I.L. with Ambassador's written "Guidelines for Implementation of Standards of Excellence" (Guidelines), by which standards Ambassador expected E.I.L. to abide in fulfilling the Program requirements.

13.   Ambassador did not tell Program participants or their families that there would be a separate organization making arrangements for the homestays in the United Kingdom, believing this information would create confusion in the marketplace.

14.   In the fall of 1998, E.I.L. representatives visited Ambassador's headquarters in Spokane, Washington. Ambassador's Pamela Duckmanton reviewed Ambassador's Guidelines with the E.I.L. representatives. Those Guidelines, among other things, encourage overseas vendors to place travelers with "host families", that is, with married couples or with single adults who have children roughly the same age as the trip participant.

15.   Ambassador sent Ms. Duckmanton on a "look and see" trip to the United Kingdom in early 1999. She traveled to the destination spots and met with E.I.L. representatives. She again explained Ambassador's Guidelines regarding homestays.

16.    Regarding the trip participants' stay in Edinburgh, Scotland, E.I.L. placed an ad in the local newspaper for homestay hosts. Mr. Ron Carroll responded to the ad and later filled out an application. The E.I.L. homestay coordinator personally interviewed Mr. Carroll in his flat and determined that he would be a suitable homestay host. Mr. Carroll had started hosting people in 1997 and had hosted a total of eight to ten people.

17.    There were three chaperones, known as Delegation Leaders, on the July 1999 Program trip. They were Cathy Ransenberg, Donald Ransenberg and Genese Leftkowitz. The chaperones represented Ambassador. The chaperones are provided a free trip in exchange for their services as chaperones.

18.    Delegation Leaders act as chaperones on the trip. They are in charge and are responsible for the well-being of the students.

19.    Safety on its programs is a paramount concern for Ambassador, and the safety and welfare of the students was the first and foremost concern of the Delegation Leaders/chaperones. Ambassador was cognizant that the children had to be protected. Ambassador expected its customers to rely on its emphasis on safety.

20.    Ambassador established "security nets" through communication procedures with chaperones.

21.    Ambassador and its chaperones took custody of the children on the Program.

22.    Ambassador believed it was important to ensure the safety of children on its programs and keep the children out of harm's way. Part of the concept of keeping minor children out of harm's way during a homestay would be to place them in a situation that would be the most safe.

5

23. The Moyer family had a right to expect that the homestays in which Joel was placed were reflective of the information placed in the Program brochures.

24. Joel and the other members of his delegation departed from the United States in July 1999. They had three homestays on their trip in Worcester, England; Killarney, Ireland; and Edinburgh, Scotland. Before each homestay, the Delegation Leader gave each participant a handout listing where each participant would be staying and a phone number where she could be contacted if any problems arose.

25. Ms. Ransenberg was aware that Joel and another student had been designated to stay with a single male in Edinburgh. Ms. Ransenberg expressed concern about the arrangements.

26. On the bus ride to Edinburgh, Ms. Ransenberg told Joel and fellow trip participant Dan Kelley that Mr. Carroll would be their homestay host. Ms. Rastenberg asked them if they were uncomfortable with that arrangement. She told them that they could call her at any time if they felt uncomfortable staying with Mr. Carroll and she would send a taxi to pick them up and they could stay with her.

27. Early in the trip, Ms. Ransenberg became so concerned about the arrangements made by E.I.L. that she called an emergency number for Ambassador in the United States and demanded attention.

28.    Joel and Dan Kelley stayed at Mr. Carroll's flat in Edinburgh for three nights. The first night was uneventful. The second night in Edinburgh, Joel and some other trip participants went to a pub where Joel consumed alcohol. Joel alleges that he was "buzzy" and a "little light-headed". This was the second time Joel had consumed alcohol on the trip. The first time, which was in Ireland, he was disciplined and told that he would be sent home if he did it again.

29.    Joel alleges that the following series of events occurred after he left the pub. Joel went back to Mr. Carroll's flat and talked with him for three hours. Mr. Carroll offered him some beer. Joel accepted and drank four or five beers. Joel eventually became sick and vomited on the living room carpet. He went into the bathroom and kneeled over the toilet. Mr. Carroll came in about five minutes later. He put his arms around Joel, kissed Joel by putting his tongue in Joel's mouth, felt up Joel's shirt, and groped Joel's penis on the outside of Joel's boxer shorts. This lasted for ten to twelve minutes. Joel eventually asked Mr. Carroll to stop, and he did. Joe walked into his bedroom, closed the door, and went to bed. Joel did not wake Daniel Kelley, who was in the bed next to his.

30.    Dan Kelley thinks he heard some talking at one point during the night of the alleged assault, but otherwise he slept though the night.

31.    Joel and Dan Kelly spent the next night at Mr. Carroll's flat without incident.

32.    After returning to the United States, Joel began school.

33.    In the late evening hours of December 30, 1999, Joel wrote a suicide note which he left in his bedroom. He wrote a separate letter to a student at school for whom he had developed a romantic attachment. He enclosed $200.00 with that letter and deposited it in a mailbox in the early morning hours of December 31. Joel then drove to the top of a three-story parking garage, sat on the ledge, and slipped himself off.

34.    Joel landed on a grassy hill and fell to the bottom. He was found by a police officer and immediately taken to the hospital. He underwent three surgeries and began a lengthy physical and mental recovery.

35.    Shortly after the suicide attempt, Mr. Moyer wrote Ambassador's Ralph Baird, who then contacted E.I.L. The matter was forwarded to the Edinburgh Police Force, which conducted a detailed criminal investigation. The investigation disclosed that Mr. Carroll had a clean record. Mr. Carroll denied sexually assaulting Joel. The Moyers elected not to pursue Mr. Carroll in Scotland.

### III. Plaintiffs' claims

Plaintiffs assert a claim against E.I.L. for negligence in its selection of Carroll as a homestay host (Count I); a negligence claim against Ambassador arising from its selection and supervision of E.I.L. as the organization handling travel and lodging arrangements (Count III); a claim against Ambassador and People to People for breach of a non-delegable duty to use reasonable care in screening and selecting host families (Count IV); a claim against Ambassador and People to People for vicarious liability for the negligence of E.I.L. (Count V); a claim against People to People for vicarious liability for the negligence of Ambassador and E.I.L. through the

doctrines of agency by estoppel and apparent agency (Count VI); a claim for loss of consortium by plaintiffs David Moyer and Marcia Moyer (Count VII); and a claim for subrogation and/or assignment of rights on behalf of Humana/Choicecare (Count VIII).

### IV. Motions for summary judgment by People to People and Ambassador

Defendants People to People and Ambassador move for summary judgment on all claims against them. Defendants claim that they are entitled to judgment as a matter of law on the grounds that Ambassador owed no duty to plaintiffs; Ambassador did not own, operate, manage or control E.I.L. or Mr. Carroll; Ambassador had no duty to prevent the alleged groping; Mr. Carroll's alleged assault was not reasonably foreseeable; Ambassador properly contracted with E.I.L.; People to People is not liable because it did not own, operate, manage or control E.I.L. and had no relationship with E.I.L.; and because defendants are not liable to Joel Moyer, they are likewise not liable to his parents on their consortium claim.

### V. Summary Judgment Standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action. This Court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor.

*Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249 (citing *Cities Serv.*, 391 U.S. at 288-289). If the evidence is merely colorable, *Dombrowski v. Eastland*, 387 U.S. 82, 84 (1967), or is not significantly probative, *Cities Serv.*, 391 U.S. at 290, judgment may be granted. *Anderson*, 477 U.S. at 249.

## VI. Request for oral argument

The legal and factual issues involved in this case have been fully briefed by the parties. The Court does not believe that oral argument would assist it in resolving the issues presented by the parties. Pursuant to Rule 7.1 of the Local Rules of the United States District Court for the Southern District of Ohio, the Court therefore finds that oral argument is not necessary and plaintiffs' request for same is denied.

## VII. Opinion

The parties argue their respective positions under Ohio law. Accordingly, the Court will apply Ohio law in determining whether defendants are entitled to summary judgment on any of plaintiffs' claims.

### 1. Effect of the exculpatory clause

Defendants argue that Ambassador owed no duty to plaintiffs because the Moyers agreed to prospectively exculpate Ambassador from any liability, and plaintiffs' allegations fit squarely within the exculpatory clause. Defendants contend that an exculpatory clause need not specifically mention negligence in order to effectively waive such claims. Defendants further

10

assert that parents can bind their children to an exculpatory clause. In response, plaintiffs argue

that the exculpatory clause is a *force majeure* clause which does not apply to negligence; the

clause must be strictly construed so as to not relieve defendants from liability for their own

negligence since a waiver of claims for negligence is not expressed in clear and unequivocal

terms and attempts to limit liability for negligence are disfavored under Ohio law; and as a minor,

Joel could not contractually waive his rights.

      A contractual waiver of liability for negligence, even if valid, is not favored under the law.

***Orlett v. Suburban Propane,*** 54 Ohio App.3d 127, 561 N.E.2d 1066, 1067 syll. ¶ 1 (1989). Such

a waiver will nonetheless be upheld absent vague or ambiguous language or unless the waiver is

unconscionable. ***Id.*** at 128. A waiver of liability for negligence will be strictly construed against

the party relying on it. ***Id***. at syll. ¶ 1. The Ohio Supreme Court has consistently held that

exculpatory provisions in contracts are to be strictly construed so as not to relieve a party from

liability for his own negligence unless the waiver is "expressed in clear and unequivocal terms".

***Swartzentruber v. Wee-K Corporation,*** 117 Ohio App.3d 420, 424, 690 N.E.2d 941, 944

(1997)(citations omitted). The fact that an exculpatory provision does not expressly use the word

"negligence" does not mean that the waiver is fatally flawed. ***Id.*** at 425. Rather, the critical

inquiry is "whether it is clear from the general terms of the entire contract, considered in light of

what an ordinary prudent and knowledgeable party of the same class would understand, that the

[defendant] is to be relieved from liability for its own negligence." ***Id.*** The Court in

***Swartzentruber*** determined that it was difficult to construe a release "from any and all claims"

that arise "out of any and all personal injuries" as anything other than a release of liability for

negligence. ***Id.*** at 426.

The exculpatory clause in the Application which Joel and his parents signed provides as follows:

> [Ambassador] acts only as agent in securing hotels, transportation, sightseeing, homestay and other travel services and in no event shall [Ambassador] be liable in the event of any failure by any person or company to render any services provided on the program. All hotels, transportation, sightseeing and other travel services are provided to program participants subject to the terms and conditions under which they are offered to the public generally. Neither [Ambassador] nor its agents shall be liable for any loss, injury or damage to person or property resulting from government actions or restraints, disturbances, hostilities, war, epidemics, quarantines, labor disputes, machinery breakdown, weather conditions, natural disaster, delays, accident, injury, death, annoyance or inconvenience *or any other cause beyond our control*. [Ambassador] shall not be liable for any additional expenses incurred by the program participants as a result of any of the foregoing causes. Doc. 84, exh. C (emphasis added).

The Court finds as a matter of law that the exculpatory clause does not clearly and unequivocally waive Ambassador's liability for its own negligence. To the contrary, the clause expressly relieves Ambassador from liability only for any cause beyond its control, including the specific causes listed in the clause. Given the unambiguous language which limits the waiver to causes beyond Ambassador's control, the clause cannot reasonably be construed as extending to negligence, a cause clearly within Ambassador's control. Accordingly, the exculpatory clause does not bar plaintiffs from pursuing their negligence claims against Ambassador.

### 2. Negligence claims against defendant Ambassador

Defendants argue that the law applicable to tour operators applies to plaintiffs' negligence claims. Defendants contend that under that law, because Ambassador did not own, operate, manage or control E.I.L. or Mr. Carroll, Ambassador cannot be held liable to travel participants for the tortious actions of those third parties. Defendants stress that it was E.I.L., not Ambassador or People to People, who selected Mr. Carroll as a homestay host and that defendants understood

that E.I.L. would follow Ambassador guidelines and place Joel with a married couple or with a single individual with children.

In support of their argument that they owed no duty to plaintiffs to prevent the alleged assault on Joel, defendants contend that Mr. Carroll's alleged assault was not reasonably foreseeable. Ambassador claims that it could not have anticipated Mr. Carroll's alleged criminal conduct because he had no prior record and Ambassador understood that E.I.L. would place Joel and other trip participants with either married couples or with a single parent with children roughly the same age as trip participants. Ambassador also contends that Joel was not a child of tender years, he was not left alone but roomed with a twenty-year old, and he declined the opportunity to change hosts when given that option. Ambassador further argues that Joel was not endangered, nor did Ambassador have any reason to know that Joel was endangered, and therefore Ambassador had no duty to protect him under the Restatement (Second) of Torts § 314A(4).
Finally, Ambassador claims that any duty it owed to plaintiffs was delegable, and in any event, E.I.L. was not negligent.

Plaintiffs argue that the tour operator cases cited by defendants do not apply in this case. Plaintiffs note that Ambassador represented that the students would be placed with "carefully selected host families", Ambassador took custody of the children, and Ambassador's own representatives have emphasized that a Program trip is different from a standard tour. In arguing that defendants owed a duty to plaintiffs, plaintiffs contend that Ambassador placed Joel in a situation where he could be assaulted by Mr. Carroll and that the risk of harm was reasonably foreseeable as evidenced by the placement Guidelines and the deposition testimony. Plaintiffs

argue that defendants had knowledge of either a specific danger posed by Joel's placement with a single male or knowledge of a general danger posed by sending children to Europe with no idea of where they would be staying. Plaintiffs claim that Ambassador's duty to protect was non-delegable.

Plaintiffs further argue that whether E.I.L. was an independent contractor is disputed. Plaintiffs note that Ambassador provided its Guidelines to E.I.L. Plaintiffs also allege that E.I.L. was Ambassador's agent under a theory of agency by estoppel. Plaintiffs claim that Ambassador purposely concealed that another agency was doing its legwork so that Ambassador's duty was non-delegable. Plaintiffs argue that to the extent Ambassador represented it was arranging the homestays, E.I.L. should be treated as its agent. Plaintiffs further argue that Ambassador's duty to investigate E.I.L. was not minimal.

The elements of a negligence claim under Ohio law are (1) defendant owed plaintiff a duty, (2) defendant breached that duty, and (3) such breach was the proximate cause of plaintiff's injuries. *Chambers v. St. Mary's School,* 82 Ohio St.3d 563, 565, 697 N.E.2d 198, 200 (1998)(citations omitted).  The existence of a duty is ordinarily a question of law.  *Mussivand v. David,* 45 Ohio St.3d 314, 318, 544 N.E.2d 265, 270 (1989). The determination of whether a breach of duty occurred and whether such breach was the proximate cause of an injury is generally a question of fact. *Strother v. Hutchinson,* 67 Ohio St. 2d 282, 288, 423 N.E.2d 467, 471 (1981).

There is no set formula for determining whether a duty exists. *Mussivand,* 45 Ohio St.3d at 318, 544 N.E.2d at 270. Duty has been described as "the court's 'expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to

14

protection.'" *Id.* (quoting Prosser, Law of Torts (4 Ed. 1971) pp. 325-26). Considerations which may justify imposition of a duty in a particular situation are "the guidance of history, our continually refined concepts of morals and justice, the convenience of the rule, and social judgment as to where the loss should fall". *Id.* (citing Prosser, *Palsgraf Revisited* (1953), 52 Mich.L.Rev. 1, 15).

Under Ohio law, the existence of a duty depends on the foreseeability of the injury. *Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.,* 45 Ohio St.3d 171, 174, 543 N.E.2d 769, 772 (1989)(citations omitted). The test for determining foreseeability is "whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." *Id.* (citing *Menifee v. Ohio Welding Products, Inc.,* 15 Ohio St.3d 75, 77, 472 N.E.2d 707, 710 (1984)). In order to owe a duty of care, it is not necessary that the defendant foresee the injury in the precise form in which it occurred. *Bohme, Inc. v. Sprint International Communications Corporation,* 115 Ohio App.3d 723, 728, 686 N.E.2d 300, 303 (1996). It is sufficient if the defendant's action or inaction was likely to result in an injury to someone. *Id.* at 728.

As a general rule, a person is under no duty to control the conduct of a third party by preventing him from causing harm to another. *Fed. Steel,* 45 Ohio St.3d at 173, 543 N.E.2d at 772. Similarly, there is no common law duty to foresee or anticipate criminal activity, and so the law does not usually require a prudent person to expect the criminal activity of others. *Id.* There are, however, special relationships which may give rise to a duty to aid or protect another,

including a duty to protect one from the criminal acts of a third party. **Fed. Steel,** 45 Ohio St.3d at 173-74. Restatement (Second) of Torts § 314A(4) sets out one such special relationship as follows:

> One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

The duty of a custodian imposed under § 314A(4) is one of reasonable care under the circumstances and encompasses protection not only against unreasonable risk of harm but also against risks arising from the negligence of the plaintiff himself. **Peyer v. Ohio Water Service Company,** 130 Ohio App.3d 426, 435, 720 N.E.2d 195, 201-02 (1998)(citing Restatement (Second) of Torts § 314A, Comments e and f). The defendant custodian is not liable where he neither knows nor should know of the unreasonable risk of injury, and the custodian need not take any action until he knows or has reason to know that the individual is endangered, ill or injured. Restatement (Second) of Torts § 314A, Comments *e* and *f.*

In determining whether there is a duty to protect against criminal acts of a third party, "the mere fact that misconduct on the part of another might be foreseen is not of itself sufficient to place the responsibility upon the defendant." **Evans v. Ohio State University,** 112 Ohio App.3d 724, 740, 680 N.E.2d 161, 171 (1996)(citing Prosser & Keeton, Law of Torts, at 305). "It is only where misconduct was to be anticipated, and taking the risk of it was unreasonable, that liability will be imposed for consequences to which such intervening acts contributed." **Id.** (citing Prosser & Keeton, Law of Torts, at 313). The foreseeability of a criminal act is determined by the knowledge of the defendant based on the totality of the circumstances. **Id.** at 742. A defendant will be held liable only when the totality of the circumstances are "somewhat overwhelming". **Id.**

16

(citing *Feichtner v. Cleveland,* 95 Ohio App.3d 388, 396, 642 N.E.2d 657, 662 (1994)).

Under the law of agency, a principal is vicariously liable for the negligence of its agents committed while acting within the scope of their agency. *Albain v. Flower Hospital,* 50 Ohio St.3d 251, 255, 553 N.E.2d 1038, 1043 (1990)(overruled in part by *Clark v. Southview Hosp. & Family Health Center,* 68 Ohio St.3d 435, 628 N.E.2d 46 (1994)). An agency relationship is "a consensual fiduciary relationship between two persons where the agent has the power to bind the principal by his actions, and the principal has the right to control the actions of the agent." *Evans,* 112 Ohio App.3d at 744, 680 N.E.2d at 174. Employers are not vicariously liable for the negligence of independent contractors retained by them, except in certain circumstances discussed below. *Albain,* 50 Ohio St.3d at 256, 553 N.E.2d at 1043. An independent contractor relationship exists when "the manner or means of doing the work or job is left to one who is responsible to the employer only for the result." *Bostic v. Connor,* 37 Ohio St.3d 144, 146, 524 N.E.2d 881, 883 (1988). The determination of who has the right to control must be made by examining the facts of each case, including factors such as "who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; the length of employment; the type of business; and any pertinent agreements or contracts". *Id.* Whether a person is an independent contractor is generally a matter to be decided by the trier of fact, unless the evidence on the point is not in conflict. *Id.* at 883, 884.

The exceptions to the rule that an employer may not be held vicariously liable for the negligence of an independent contractor are: (1) an employer may be directly liable for injuries resulting from its own negligence in selecting or retaining an independent contractor; (2) an employer may be held vicariously liable for the negligence of an independent contractor

performing certain non-delegable duties which are imposed by statute, contract, franchise, charter, or the common law; and (3) an employer may be held vicariously liable for the negligence of an independent contractor under the doctrine of agency by estoppel, "which requires a showing of induced reliance by a third person upon an ostensible agency." *Albain,* 50 Ohio St.3d at 257, 553 N.E.2d at 1044 (citations omitted).

With regard to the first exception, an employer must exercise reasonable care in the selection of a competent and careful independent contractor. *Albain,* 50 Ohio St.3d at 257, 553 N.E.2d at 1045 (citing Restatement (Second) of Torts § 411).

Under the second exception, "[a]n employer is liable for injuries caused by the failure of an independent contractor to exercise due care in the performance of work which is inherently or intrinsically dangerous . . . however skillfully done." *Bohme,* 115 Ohio App.3d at 733, 686 N.E.2d at 307. "'Where danger to others is likely to attend the doing of certain work, unless care is observed, the person having it to do, is under a duty to see that it is done with reasonable care, and cannot, by the employment of an independent contractor, relieve himself from liability for injuries resulting to others from the negligence of the contractor or his servants.'" *Id.* at 733 (citing *Richman Bros. v. Miller,* 131 Ohio St. 424, 3 N.E.2d 360, Syll. ¶ 1 (1936). Employers are held liable under the traditional non-delegable duty exception in cases where "the nature of the work contracted involves the need for some specific precaution, such as a railing around an excavation in a sidewalk", or where the work involved is "inherently dangerous, such as blasting." *Albain,* 50 Ohio St.3d at 261, 553 N.E.2d at 1048. "Liability is premised on the peculiar risks and special precautions attendant to the work itself, not upon a 'holding out' by an employer that it has assumed a particular duty." *Id.*

18

The third exception to the rule of liability for an independent contractor's negligence, agency by estoppel or apparent agency, has been recognized by various courts based on either the Restatement (Second) of Agency § 267 or Restatement (Second) of Torts § 429. *Id.* at 1048. Section 429 provides as follows:

> One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

In determining whether Ambassador owed a duty to Joel, the Court initially finds that defendants' attempts to liken this case to cases in which the courts have found tour operators not liable for actions of third-party suppliers they do not own, operate, or control are unavailing. Ambassador's own employee, Diane Moore-Critchlow, Director of Student Programs during the period in issue, and Delegation Leader Cathy Ransenberg testified at their depositions that Ambassador is more than a mere tour operator. (Ransenberg depo., pp. 70, 108-09; Moore-Critchlow depo., pp. 106-08). The facts support their characterization. The Ambassador Program is geared toward students, and specifically children, who are entitled to a higher degree of care than the adults in the travel cases cited by defendants (see *Di Gildo v. Caponi,* 18 Ohio St.2d 125, 127, 247 N.E.2d 732, 734 (1969)), a point which Ambassador has essentially conceded. Ambassador acknowledges that it had taken custody of the children for purposes of the 1999 trip, the children required protection, safety of the children was of paramount concern to it, Ambassador tried to keep the children out of harm's way, and the children's parents had the right to rely on Ambassador's emphasis on safety. Thus, the case law applicable to tour operators which defendants have cited does not apply to this case, and the fact that People to People and

19

Ambassador did not own, operate or control E.I.L. does not, standing alone, absolve defendants from liability for the negligence of E.I.L.

In considering the totality of the circumstances, the Court determines that Ambassador owed a duty of reasonable care to plaintiffs under the circumstances, including a duty to exercise reasonable care to protect Joel against unreasonable risk of harm from the criminal acts of a third party. Ambassador took Joel into its custody for purposes of the trip and thereby assumed the duty of care which the law imposes on one who has taken custody of another under circumstances where the other, in this case a minor, is deprived of his normal opportunities for protection.

The imposition of a duty of care on Ambassador as custodian of Joel is appropriate because the evidence supports a finding that Ambassador should have reasonably anticipated a possibility of harm to Joel if it failed to exercise reasonable care while he was in Ambassador's custody, and particularly if it failed to exercise reasonable care in fulfilling its obligation to place Program participants in suitable homestays. There is a reason Ambassador's Guidelines specify that students will stay with host families which consist of a married couple or a single parent with children of comparable age to that of the student. It is reasonable to infer that such a specification is designed, in part, to protect children from the risk of harm posed by an inappropriate homestay, including the risk of becoming the victim of criminal behavior by a host such as that which allegedly occurred during Joel's homestay with Mr. Carroll. Ambassador's recognition of the need to exercise caution in administering the homestay portion of the Program is demonstrated by its assurances to participants and their families that students would be placed only with "carefully selected host families".

A finding that Ambassador anticipated an unreasonable risk of harm if it failed to

20

exercise reasonable care in placing students in homestays is supported by the deposition testimony of Ms. Moore-Critchlow and Delegation Leader Cathy Ransberg. Ms. Moore-Critchlow testified that parents of prospective program participants sometimes expressed concerns about the homestays, which she considered to be only natural. (Depo., pp. 52-53). Ms. Moore-Critchlow specifically testified she believed parents might forego having their son participate in the Program if they knew he might stay with a thirty-one or thirty-two year old single male. (Depo. pp. 55-56). Ms. Ransenberg testified that Ambassador represented to prospective travelers that the homestay "would be a family situation with at least one parent and children" and that Joel and Dan Kelley's stay with a single male did not comport with her definition of a "homestay family." (Depo. pp. 34-35).  Ms. Ransenberg testified that when she saw that Joel and Dan Kelley were staying with a single man, she was "very upset". (Depo., pp. 62-62). She stated that she "felt extremely uncomfortable having these boys stay with a single man" and she felt that the arrangement did not "meet with People to People's expectations that students would be staying with a parent with children, a family as [she] defines it." (Depo., p. 63).

Based on this evidence and the common sense understanding that a child could face an unreasonable risk of harm if placed in an inappropriate homestay, the Court finds as a matter of law that Ambassador had a duty to exercise reasonable care to protect Program participants, and particularly minor children, against such a risk.

Ambassador claims that it cannot be held liable to plaintiffs for injury allegedly caused by acts or omissions of E.I.L. because E.I.L. was an independent contractor. Although the parties dispute E.I.L.'s role, the Court will assume for purposes of the summary judgment motion that E.I.L. was an independent contractor. The Court finds that under the unique circumstances of this

case, Ambassador may be held liable for acts or omissions of E.I.L. relating to the homestay placements. Ambassador clearly accepted responsibility for this aspect of the Program when recruiting Program participants. The General Conditions Section of the Application expressly states that Ambassador would be charged with making travel arrangements, and in particular the homestays. In addition, Ms. Moore-Critchlow testified at her deposition that if a family would ask about the entity making overseas arrangements, she would tell them that Ambassador takes the responsibility (Depo., p. 54). Having made such representations, and having failed to disclose to Program participants and their parents that a third party would actually select the homestay hosts and make the homestay arrangements, Ambassador cannot now disavow the responsibility it purported to shoulder and shift liability to E.I.L. for any injury resulting from a negligent homestay placement. See Restatement (Second) of Torts § 429. This is particularly true since Ambassador was aware through its Delegation Leader Ms. Ransenberg that Joel was to be placed with a single male host.

The Court further determines that Ambassador's duty to exercise reasonable care to protect Program participants against unreasonable risk of harm was non-delegable because participation in the Ambassador Program posed inherent risks which are unique to that situation and which called for a special degree of care. Although this case does not present the type of situation where the inherent danger doctrine is typically applied, the case does involve a situation where "danger is likely to attend . . . unless care is observed."  It is evident that certain unique dangers attend a child's travel to a foreign county without a parent and his placement in the homes of strangers and that precautions and extra care must be taken to insure that the child is not exposed to unnecessary and unreasonable risks. Accordingly, the Court finds that Ambassador

may be held vicariously liable for negligent acts or omissions of E.I.L. in connection with Joel's homestay.

### 3. Breach of duty by Ambassador/proximate cause

There are questions of fact in this case as to whether Ambassador breached a duty which it owed to plaintiffs and, if so, whether the breach was a proximate cause of the injury plaintiffs allege. These issues are for the jury to determine. Therefore, summary judgment in favor of Ambassador is not appropriate.

### 4. Liability of People to People

Defendants allege that People to People is not liable on any of plaintiffs' claims because People to People did not own, operate, manage or control EIL and had no relationship with EIL; the alleged criminal assault was not reasonably foreseeable and People to People had no knowledge that Joel was ever endangered; People to People had no contract with the Moyers; and it is not liable under agency by estoppel or apparent agency. Defendants argue that People to People merely licensed its name to Ambassador so that Ambassador, an independent contractor, could conduct the Program.

Plaintiffs argue that People to People is liable under an apparent agency theory because there was a deliberate blurring of corporate distinctions between it and Ambassador; Ambassador was acting on behalf of People to People and under its authority; and to the extent it was unclear whether Ambassador was actually undertaking arrangements made in People to People's name, it was acting as an agent under apparent authority. Defendants note that the letterhead and marketing of both People to People and Ambassador claim President Eisenhower as the Founder and the current United States President as the Honorary Chair, and that People to People has

acknowledged the Program is its program which Ambassador operates.

Although plaintiffs claim that they seek to hold People to People liable based on agency principles, and specifically the doctrine of apparent authority, they have cited no legal authorities to support the imposition of liability on People to People under agency principles. Nor has plaintiff come forward with evidence to show that People and People and Ambassador had an agency relationship. The Court fails to perceive how People to People could be held liable under an apparent agency theory based on the evidence plaintiffs have presented. Accordingly, the Court will grant summary judgment in favor of People to People on the negligence claims against it.

### 5. Loss of consortium claim

Defendants argue that because they are not liable to Joel Moyer, they are likewise not liable to his parents on their loss of consortium claim. As there are issues of fact underlying resolution of the negligence claims against Ambassador, defendant Ambassador is not entitled to summary judgment on the loss of consortium claim. The Court will grant summary judgment in favor of defendant People to People on the loss of consortium claim since People to People is entitled to summary judgment on the negligence claims against it. See *Messmore v. Monarch Machine Tool Co.,* 11 Ohio App.3d 67, 68-69, 463 N.E.2d 108, 110 (1983).

### VII. Conclusion

Plaintiffs' motion for partial summary judgment is **GRANTED** to the extent plaintiffs seek a ruling that defendant Ambassador owed a duty to plaintiffs and **DENIED** insofar as plaintiffs seek a similar ruling against People to People. Defendants' motion for summary judgment is **DENIED** as to Ambassador and **GRANTED** as to People to People. The claims against People to People are **DISMISSED.** Defendant People to People is **DISMISSED** from the lawsuit. This case will proceed to trial on the remaining claims in accordance with the schedule established by the Court.

**IT IS SO ORDERED.**

S/ Herman J. Weber
_____
HERMAN J. WEBER
SENIOR JUDGE, UNITED STATES DISTRICT COURT

J:\HJWA\01-140msjkneg.wpd

25