*2000 U.S. App. LEXIS 498, \**

BENNETT JUSTICE, individually and as father and next friend of Alexandria Justice, Plaintiff-Appellant, v. MARION COUNTY SHERIFF'S DEPARTMENT, MARION COUNTY BOARD OF COMMISSIONERS, RALPH OILER, and BILLYIE JUSTICE, Defendants-Appellees.

No. 99-3123

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

2000 U.S. App. LEXIS 498



EXHIBIT C

January 6, 2000, Filed

**NOTICE:** [*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 2000 U.S. App. LEXIS 3932.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO. 97-07164. Katz. 12-21-98.

**DISPOSITION:** AFFIRMED.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff appealed from judgment of United States District Court for Northern District of Ohio, which granted summary judgment against plaintiff's claims of negligence, willful and wanton conduct, failure to train and supervise under 42 U.S.C.S. § 1983, punitive damages, loss of consortium, and attorney fees under 42 U.S.C.S. § 1988.

**OVERVIEW:** Plaintiff's daughter was shot in the jaw by her brother, who was using a police officer's unattended gun. Plaintiff filed suit against defendant, deputy and county, alleging various civil claims and damages. Defendants removed the case to district court, and moved for summary judgment on the basis of immunity, which the district court granted. Plaintiff appealed, arguing the court erred in interpreting Ohio's political subdivision tort liability statute, and the extent to which it provided immunity for defendants. Ohio Rev. Code Ann. § 2744.02(A)(1) provided that immunity attached to defendant deputy's actions because he was required by the sheriff's office to carry a weapon at all times, and therefore the incident with defendant deputy's gun occurred while he was fulfilling a part of his job requirement. Neither defendants, deputy or county, under a totality of the circumstances, acted in bad faith, or in a wanton or reckless manner.

**OUTCOME:** Judgment of district court affirmed. Under totality of the circumstances, defendant deputy's behavior did not support a finding of wanton or reckless behavior. Reasonable minds could not have concluded that defendant county acted in bad faith or in a wanton or reckless manner in administering its training and supervision policies.

**CORE TERMS:** wanton, political subdivision, reckless, firearm, gun, omission, immunity, matter of law, revolver, immune, summary judgment, deputy, training, wanton misconduct, police officer, tort liability, weapon, loaded, supervision, perversity, malicious, shooting, probability, detainee, deputy sheriff, entitled to immunity, independent basis, giving rise, accessible, undisputed

**LexisNexis (TM) HEADNOTES - Core Concepts -** ♦ Hide Concepts



Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction
Civil Procedure > Jurisdiction > Diversity Jurisdiction
Civil Procedure > State & Federal Interrelationships > Application of State Law

**HN1** ⬩ A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction. In cases filed under diversity jurisdiction, federal standards regarding the propriety of granting summary judgment apply. More Like This Headnote

Civil Procedure > Summary Judgment
Civil Procedure > Appeals > Standards of Review > De Novo Review
**HN2** ⬩ An appellate court reviews de novo the district court's grant of summary judgment. More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard
**HN3** ⬩ Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof
Civil Procedure > Summary Judgment > Summary Judgment Standard
**HN4** ⬩ In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. The judge is not to weight the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. A genuine issue for trial exists when there is sufficient evidence on which the jury could reasonably find for the plaintiff. More Like This Headnote

Torts > Public Entity Liability
**HN5** ⬩ For purposes of the Ohio political subdivision tort liability statute, the functions of a political subdivision are classified as either governmental functions or proprietary functions. Ohio Rev. Code Ann. § 2744.02(A)(1). Included within the definition of governmental function is the provision or non-provision of police. Ohio Rev. Code Ann. § 2744.01(C)(2)(a). More Like This Headnote

Torts > Public Entity Liability > Immunity
Torts > Public Entity Liability > Liability
**HN6** ⬩ The Ohio political subdivision tort liability statute provides for political subdivision tort immunity as follows: A political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function. Ohio Rev. Code Ann. § 2744.02(A)(1). Certain exceptions to this broad statement of political subdivision immunity are enumerated in Ohio Rev. Code Ann. § 2744.02(B). More Like This Headnote

Torts > Public Entity Liability > Immunity
**HN7** ⬩ Ohio Rev. Code Ann. § 2744.03 sets forth "defenses and immunities" available to political subdivisions and their employees. More Like This Headnote

Torts > Public Entity Liability > Immunity
**HN8** ⬩ See Ohio Rev. Code Ann. § 2744.03.

Torts > Public Entity Liability > Liability
**HN9** ⬩ Ohio Rev. Code Ann. § 2744.03(A)(6), provides that an employee has no immunity where the acts or omissions were outside the scope of employment, or the acts or omissions were done with a malicious purpose, in bad faith, or in a wanton or reckless manner. More Like This Headnote

Torts > Public Entity Liability > Liability
Torts > Negligence > Duty > Duty Generally
**HN10** ⬩ The Supreme Court of Ohio has determined that the standard for showing wanton misconduct is high. Wanton misconduct is the failure to exercise any care whatsoever. Mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor. Such perversity must be under such conditions that the actor must be conscious that his conduct will in all probability result in injury. The actor's conduct is in reckless disregard of the safety of others if such risk is substantially greater than that which is necessary to make his conduct negligent. More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard
Torts > Negligence

**HN11** The issue of wanton misconduct is normally a jury question. However, both federal and Ohio law mandate the entry of summary judgment when reasonable minds cannot differ about the outcome. More Like This Headnote

Torts > Negligence
Torts > Public Entity Liability > Immunity
Torts > Public Entity Liability > Liability

**HN12** An attempt to exercise care will not alone preclude a finding of wanton or reckless behavior. A defendant's actions, when viewed in conjunction with other relevant facts, which are inconsistent with the "failure to exercise any care whatsoever" factor, do not rise to a level substantially greater than that which is necessary to make his conduct negligent. More Like This Headnote

**COUNSEL:** For BENNETT JUSTICE, Plaintiff - Appellant: Christopher F. Parker, Schnorf & Schnorf, Toledo, OH.

For MARION COUNTY SHERIFF'S DEPARTMENT, MARION COUNTY BOARD OF COMMISSIONERS, RALPH OILER, Defendants - Appellees: J. Stephen Teetor, Douglas J. Suter, Isaac, Brant, Ledman & Teetor, Columbus, OH.

For BILLYIE JUSTICE, Defendant - Appellee: Daniel E. Shifflet, Marion, OH.

**JUDGES:** Before: JONES, COLE, and GILMAN, Circuit Judges.

**OPINIONBY:** RONALD LEE GILMAN

**OPINION: RONALD LEE GILMAN, Circuit Judge.** Bennett Justice appeals from an adverse summary judgment ruling by the district court on certain state law claims against Deputy Sheriff Ralph Oiler, the Marion County Sheriff's Department, and the Marion County Board of Commissioners. This [*2] dispute arises out of the accidental shooting of Justice's daughter by her teenage brother, who inadvertently discharged Oiler's gun when it was left unattended in their home. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual background

The facts of this case are largely undisputed. Billyie Justice Oiler (Billyie) and Justice are the biological parents of Bennett Justice III (BJ) and Alexandria Justice (Alexandria). At the time of the incident giving rise to this lawsuit, Billyie and Justice were separated and involved in divorce proceedings. BJ and Alexandria were fifteen and ten years old, respectively. Oiler had been dating Billyie and was residing in Billyie's and Justice's marital home with Billyie, BJ, and Alexandria. Billyie and Oiler have since married.

Oiler became a deputy sheriff in 1982, and at the time of the incident held the rank of sergeant with the Sheriff's Department. He has received extensive training and is a certified firearms instructor. The Sheriff's Department in large measure follows the policies and procedures established by the Ohio Peace Officer Training Academy (OPOTA). Accordingly, [*3] all of the deputy sheriffs in Marion County are certified peace officers. The Sheriff's Department also has established a comprehensive firearm use policy, which is acknowledged and signed by all deputies. An initial firearms policy, drafted by the Sheriff's Department, was submitted to and approved by OPOTA. Pursuant to the training program employed by the Sheriff's Department, deputies must "qualify" with their firearms on a quarterly basis. The Sheriff's Department requires that its deputies "arm themselves" or have a weapon available to them at all times. As of the date of the accident, Oiler had recently been issued a .357 Magnum revolver to go along with his shotgun and .40-caliber semi-automatic pistol.

BJ was familiar with firearms well before the incident in question. He had received formal hunter's training and was a member of his school's trap shooting team. In addition, BJ owned and operated multiple guns, with both Justice's and Billyie's knowledge and permission. Oiler was aware of BJ's familiarity with and use of firearms.

The accidental shooting occurred on Sunday, October 15, 1995. The day began with Alexandria visiting Justice at a location away from her residence [*4] on Marseilles Galion Road in Marion, Ohio. Oiler, Billyie, and BJ were spending that Sunday at home, awaiting Alexandria's return. The four had planned to go out to dinner when she got back. At approximately 11:00 a.m., Oiler consumed three slices of pizza and a beer. Sometime thereafter, BJ expressed an interest in Oiler's newly-issued revolver. Oiler satisfied BJ's curiosity by demonstrating how to safely handle such a firearm. After doing so, he had BJ "dry fire" the gun. Dry firing a weapon involves pulling the trigger when it is unloaded. Oiler thereafter loaded the revolver and permitted BJ to fire a few rounds in the backyard of the Marseilles Galion Road house.

At approximately 1:30 p.m. that day, Brian Lovell and his fiance at the time, Kathy Green, arrived at the residence. Lovell is another deputy in the Sheriff's Department. Oiler had invited Lovell and Green to the house for target practice. Along with Billyie and BJ, the two deputies and Green spent the early afternoon shooting clay pigeons. When the group finished, they re-entered the house, and Billyie and BJ eventually began watching television in a first-floor room adjacent to the living and eating area. Lovell and [*5] Green left the premises at approximately 4:30 p.m.

At approximately 6:00 p.m., Oiler loaded his new revolver and announced to Billyie and BJ that it was now "hot." Both Billyie and BJ indicated to Oiler that they had heard his announcement. Although he had intended to place the gun in his truck, he instead inserted it into its leather holster and placed it on a counter in the living/kitchen area. Oiler then proceeded to an upstairs room in the house to prepare himself for dinner. He was soon joined by Billyie.

Alexandria arrived at the residence shortly before 6:00 p.m. According to BJ's affidavit, the following then occurred:

> Without permission, I picked up the revolver and took it out of the holster. I pulled the trigger on that handgun, having forgotten that Ralph Oiler told me the revolver was loaded and thinking I was "dry firing" the weapon. My sister came into the line of fire at exactly that time and was accidentally hurt.

Alexandria was struck in the jaw. Upon hearing the gunshot, Billyie, followed by Oiler, rushed downstairs to find Alexandria still on her feet, but staggering. While Billyie called 911, Oiler assisted Alexandria to the floor. Deputy Sheriffs [*6] Duane Meadows and Brian Parish were the first to arrive at the scene, followed by Captain Kenneth Wertz, Captain Al Hayden, and Deputy Chief Timothy Blailey. At approximately 7:00 p.m., shortly after medical personnel responded to the Marseilles Galion Road residence, Alexandria was air-lifted to a nearby hospital.

Meadows and Parish were the first to question BJ and Oiler. BJ admitted to Meadows that, prior to pulling the revolver's trigger, he had failed to check if it was loaded. While interviewing Oiler, Parish noticed a "faint to light moderate" odor of alcohol on Oiler's breath. Meadows did not make a similar observation. At Hayden's direction, Meadows sketched and photographed the room in which the accident occurred. By approximately 10:30 p.m., most of the individuals at the scene had proceeded to the hospital where Alexandria had been admitted. While there, Blailey detected the smell of alcohol emanating from Oiler's breath. Despite Parish's and Blailey's observations regarding alcohol, neither officer requested Oiler to submit to any kind of breath or blood-alcohol test.

Although Alexandria survived the accident, she has undergone numerous operations and procedures to reconstruct [*7] the bones in and around her jaw. No internal disciplinary action was ever taken against Oiler. Pursuant to departmental policy, the results of the Sheriff's Department investigation were referred to the Marion County Prosecutor's Office. No criminal charges, however, were ever brought against BJ, Oiler, or anyone else involved.

**B. Procedural background**

On January 22, 1997, Justice, individually and as Alexandria's father and next friend, filed suit in the Court of Common Pleas of Marion County against Oiler, Billyie, the Sheriff's Department, and the Board. His complaint alleged negligence, willful and wanton conduct, failure to train and supervise pursuant to 42 U.S.C. § 1983, punitive damages, loss of consortium, and attorneys' fees pursuant to 42 U.S.C. § 1988. On February 21, 1997, the defendants filed a notice of removal to the United States District Court for the Northern District of Ohio. The district court assumed jurisdiction on March 6, 1997.

Oiler, the Sheriff's Department, and the Board filed motions for summary judgment on April 16, 1998, primarily arguing that, despite the unfortunate chain of events giving **[*8]** rise to the suit, each was immune from liability. The district court, by order dated July 6, 1998, granted their motions. In its accompanying memorandum opinion, the district court ruled that (1) Oiler could not be liable pursuant to § 1983 because Justice did not establish that Alexandria was deprived of a constitutional right or that Oiler's conduct constituted state action, (2) Oiler was immune from tort liability under Ohio law because, as a matter of law, his conduct was not reckless or wanton, (3) the adequate nature and extent of the Sheriff's Department's internal policies and procedures precluded any failure-to-train claim, (4) the lack of a constitutional violation defeated Justice's § 1983 action against the Sheriff's Department and the Board, and (5) the Sheriff's Department and the Board were explicitly immune under Ohio's political subdivision tort liability statute. In light of the above rulings, the district court declined to consider Oiler's additional argument that he is also immune from suit due to his personal bankruptcy.

On December 7, 1998, Justice moved to dismiss all claims against Billyie. The district court granted the motion on December 21, 1998.

In this **[*9]** appeal, Justice does not contest the district court's decision to grant the defendants' summary judgment motions with respect to his federal claims. Rather, he takes issue with the district court's interpretation of Ohio's political subdivision tort liability statute and the extent to which it provides for immunity in this case.

## II. ANALYSIS

### A. Standard of review

"A *HN1* federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." Super Sulky, Inc. v. United States Trotting Ass'n, 174 F.3d 733, 741 (6th Cir. 1999). In cases filed under diversity jurisdiction, federal standards regarding the propriety of granting summary judgment apply. See Schultz v. Newsweek, Inc., 668 F.2d 911, 917 (6th Cir. 1982).

*HN2* We review de novo the district court's grant of summary judgment. See Smith v. Ameritech, 129 F.3d 857, 863 (6th Cir. 1997). *HN3* Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. See FED. R. CIV. **[*10]** P. 56(c). *HN4* In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). The judge is not "to weight the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

### B. Ohio's political subdivision tort liability statute

The disposition of this case requires a brief discussion, at the outset, of Ohio's political subdivision tort liability statute. *HN5* For purposes of the statute, the functions of a political subdivision are classified as either governmental functions or proprietary functions. See OHIO REV. CODE ANN. § 2744.02(A)(1). Included within the definition of governmental function is "the provision or nonprovision of police." See id. § 2744.01 (C)(2)(a). **[*11]** *HN6* The statute provides for political subdivision tort immunity as follows: "[A] political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." Id. § 2744.02(A)(1). Certain exceptions to this broad statement of political subdivision immunity are enumerated in § 2744.02(B), none of which are relevant here. Oiler acknowledges in his brief that no cause of action is presented under § 2744.02(B).

*HN7* Section 2744.03 sets forth "defenses and immunities" available to political subdivisions and their employees. It states, in pertinent part, as follows:

> (A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to persons or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or

. . .

> (5) The political subdivision is immune from **[*12]** liability if the injury, death, or loss to persons or property resulted from the exercise of discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources *unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner*.
>
> (6) . . . the employee is immune from liability unless one of the following applies:
>
> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
>
> (b) The employee's acts or omissions *were with malicious purpose, in bad faith, or in a wanton or reckless manner*,
>
> . . .
>
> (B) Any immunity or defense conferred upon, or referred to in connection with, an employee by division (A)(6) or (7) of this section does not affect or limit any liability of a political subdivision for an act or omission of the employee as provided in section 2744.02 of the Revised Code.

Id. § HN8 2744.03 (emphasis added).

## C. The district court did not err in concluding that Oiler was entitled to immunity

As provided by § HN9 2744.03(A)(6), "an employee has **[*13]** no immunity where the acts or omissions were outside the scope of employment, or the acts or omissions were done with a malicious purpose, in bad faith, or in [a] wanton or reckless manner." Brkic v. City of Cleveland, 653 N.E.2d 1225, 1228 (Ohio Ct. App. 1995). The district court found that Oiler was "not in the process of exercising his authority as a law enforcement officer" in connection with its analysis of whether the Sheriff's Department was entitled to political subdivision immunity. On the other hand, in determining whether individual immunity was available for Oiler, the district court concluded as follows: "To the extent that . . . Oiler was required to carry an [sic] weapon while he was off-duty, he can be considered to have been acting within the scope of his employment and thus, immune under O.R.C. § 2744.03(A)(6)(a)." Despite this apparent inconsistency, Justice does not contend on appeal that the district court erred in not applying the "outside-the-scope-of-employment" exception, nor does he assert that Oiler acted with a malicious purpose or in bad faith. Rather, he argues that the district court erred when it concluded that, as a matter of law, **[*14]** Oiler's actions or inactions did not constitute wanton or reckless behavior.

In considering whether conduct is wanton or reckless, the Supreme Court of Ohio recently set forth the standard as follows:

> HN10 The standard for showing wanton misconduct is . . . high. In *Hawkins v. Ivy* (1977), 50 Ohio St. 2d 114, 363 N.E.2d 367, 4 Ohio Op. 3d 243 syllabus, we held that wanton misconduct was the failure to exercise any care whatsoever. In *Roszman v. Sammett* (1971), 26 Ohio St. 2d 94, 96-97, 269 N.E.2d 420, 422, 55 Ohio Op. 2d 165, 166, we stated, "mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor." Such perversity must be under such conditions that the actor must be conscious that his conduct will in all probability result in injury. Id. at 97, 269 N.E.2d at 423, 55 Ohio Op. 2d at 166. In *Thompson v. McNeill* (1990), 53 Ohio St. 3d 102, 559 N.E.2d 705, we employed the recklessness standard as enunciated in 2 Restatement of the Law 2d, Torts (1965), at 587, Section 500: "The actor's conduct is in reckless disregard of the safety of others if **[*15]** . . . such risk is substantially greater than that which is necessary to make his conduct negligent."

*Fabrey v. McDonald Village Police Dep't*, 70 Ohio St. 3d 351, 639 N.E.2d 31, 35 (Ohio 1994) (omissions in original). *Fabrey* involved a suit by a police officer against his chief, his department, and his village. The police officer was injured when he attempted to enter a jail cell in which a detainee had started a fire by igniting his mattress with a cigarette lighter. The injured police officer did not submit any evidence as to how the detainee obtained the lighter, nor did he allege that the chief provided one to the detainee. 639 N.E.2d at 36. In analyzing the chief's liability, the Supreme Court of Ohio noted that "the issue of wanton misconduct is normally a jury question." *Id.* at 35. The court, however, approved of the trial court's grant of summary judgment in favor of the chief, reasoning that his conduct, "while arguably negligent," did not rise to the level of wanton misconduct. *Id.* at 36.

The decisions in *Minor v. City of Hamilton*, 1993 Ohio App. LEXIS 2866, 1993 WL 192919 (Ohio App. Ct. 1993) (unpublished), and *Nearor v. Davis*, 118 Ohio App. 3d 806, 694 N.E.2d 120 [*16] (Ohio App. Ct.), *appeal not allowed*, 681 N.E.2d 442 (Ohio 1997), are also instructive. In *Minor*, a part-time police officer brought suit against another officer, the department, and the city. The police officer was accidentally injured during target practice at the city's indoor shooting range when a bullet fragment from the other officer's firearm ricocheted off of a metal backstop and struck the officer in the leg. Finding that "the evidence [did] not show that [the shooter] acted willfully, wantonly, or recklessly," the court held that the trial court did not err in granting summary judgment in the defendants' favor. *Minor*, 1993 WL 192919 at *3.

In *Nearor*, a wrongful death action was brought against the parents of a teenager who shot his friend using a loaded revolver that was left under the parents' mattress. Neither parent had ever provided their son with firearms training, but the teenager had shot a gun before under his father's supervision. In evaluating whether the parents negligently caused the firearm to be accessible to their son, the court commented as follows:

> We are unwilling to adopt the doctrine that the owner [*17] of a gun "should be held absolutely liable for any injury that occurs when he permits or leaves the firearm accessible to children." Likewise, we cannot conclude as a matter of law that a gun being accessible to a sixteen-year-old always constitutes a danger to others. Thus, the query is whether a parent knows or should know that because of the child's age, judgment, or experience, the gun may become a source of danger to others.

*Nearor*, 694 N.E.2d at 124-25 (citations omitted). Noting that, but for a few instances, the son had exhibited no tendency towards bad behavior, the court held as a matter of law that the victim's injuries were not foreseeable to the parents of the shooter

> in that the cited specific instances of prior conduct were insufficient either to put a reasonable person on notice that [the son] was likely to shoot [his friend] or to show that the [parents] knew or should have known that because of their son's age, judgment, or experience the gun could become a source of danger to others.

*Id.* at 125.

Despite the above authorities, Justice argues that Oiler's acts or omissions constituted, as a matter of law, wanton or [*18] reckless conduct. He also contends that, even if the conduct was not wanton or reckless as a matter of law, at least reasonable minds could differ on the question and, therefore, summary judgment in favor of the defendants was inappropriate. We acknowledge that "the [HN11] issue of wanton misconduct is normally a jury question." *Fabrey*, 639 N.E.2d at 35. Both federal and Ohio law, however, mandate the entry of summary judgment when reasonable minds cannot differ about the outcome *See Anderson*, 477 U.S. at 250; *Reynolds v. City of Oakwood*, 38 Ohio App. 3d 125, 528 N.E.2d 578, 582 (Ohio App. Ct. 1987).

In light of the Ohio decisions in *Fabrey*, *Minor*, and *Nearor*, we find no error in the district court's ruling. First, Justice presented no evidence that would establish a "disposition of perversity" on the part of Oiler. Justice does not contend that Oiler had such a disposition--that is, a tendency to turn away from what is right or good. Second, even if Justice had established the existence of a perverse disposition, the perversity would have to be "under such conditions that the actor must be conscious that his conduct will in all [*19]

probability result in injury." Justice presented no evidence showing that Oiler was actually aware that his conduct "in all probability" would have resulted in the injuries sustained by Alexandria.

Furthermore, it is undisputed that BJ had experience with owning, maintaining, and operating firearms. Justice does not contend that BJ exhibited behavior prior to October of 1995 that would have caused Oiler to believe that BJ would likely engage in dangerous behavior with respect to weapons left unattended in the Marseilles Galion home. Finally, Justice does not dispute that Oiler issued an affirmative warning to Billyie and BJ that the gun was loaded. <sup>HN12</sup>Although an attempt to exercise care will not alone preclude a finding of wanton or reckless behavior, see Reynolds, 528 N.E.2d at 582, Oiler's attempts in this case, when viewed in conjunction with the other facts cited above, are inconsistent with the "failure to exercise any care whatsoever" factor cited in Fabrey. We therefore conclude that Oiler's conduct on the day in question might have been negligent, but did not rise to a level that disregarded a risk "substantially greater than that which is necessary to make [*20] his conduct negligent."

In support of his argument, Justice cites Oiler's consumption of alcohol. Although we find it troublesome that Oiler, a veteran police officer, drank beer just prior to the planned use of weapons, the fact that he did so does not negate his warnings, nor does it negate the other factors, such as no knowledge of any foolish behavior by BJ in the past. Justice also argues that Oiler's conduct was wanton and reckless because he "violated several established safety rules promulgated by the Peace Officer Training Council." Id. at 22. We conclude, however, that even if such rules were violated, a consideration of the totality of the circumstances in this case does not support a finding of wanton or reckless behavior. See Rodgers v. DeRue, 75 Ohio App. 3d 200, 598 N.E.2d 1312, 1315 (Ohio Ct. App. 1991) (dismissing as "irrelevant" a police officer's violation of an internal departmental procedure and concluding that in light of "the totality of the evidentiary materials" the officer's conduct was not willful or wanton as a matter of law).

Because we affirm on the same basis relied upon by the district court, we find no need to address the bankruptcy [*21] issue raised by Oiler.

### D. The district court did not err in concluding that the Sheriff's Department and the Board were entitled to immunity

Justice next argues that the district court erred when it concluded that the Sheriff's Department and the Board were explicitly immune under Ohio's political subdivision tort liability statute. Citing § 2744.03(A)(5), Justice contends that the Sheriff's Department administered its deputy sheriff training and supervision "in bad faith or in a wanton or reckless manner subjecting the Sheriff's Department to liability." He further asserts that such training and supervision procedures constitute the policy of the Board. Justice thus concludes that neither the Sheriff's Department nor the Board is entitled to immunity under the Ohio statute. In response, the Sheriff's Department contends that § 2744.03(A)(5) does not establish an independent basis for liability and that the provision is only implicated if a plaintiff can show that the actions giving rise to the suit fall within one of the exceptions enumerated in § 2744.02(B).

Although the Supreme Court of Ohio has explicitly rejected the notion that § 2744.03(A)(5) provides an independent [*22] basis for imposing liability, see Cater v. City of Cleveland, 83 Ohio St. 3d 24, 697 N.E.2d 610, 617 (Ohio 1998), Justice argues that the Cater decision was only by plurality and that it is inconsistent with Brkic v. City of Cleveland, 653 N.E.2d 1225, 1228 (Ohio Ct. App. 1995). We need not determine, however, whether a plaintiff can rely on that provision as grounds for suit because, even if § 2744.03(A)(5) were deemed to provide an independent basis for liability, reasonable minds could not conclude that either the Sheriff's Department or the Board acted in bad faith or in a wanton or reckless manner in administering its training and supervision policies.

It is undisputed that the Sheriff's Department, in following the guidelines established by the Ohio Peace Officer Training Academy, has implemented a broad range of policies and procedures designed to promote firearm safety. In support of his argument, Justice attempts to poke holes in those policies and procedures by citing situations not expressly covered by the Sheriff's Department's guidelines. Justice, however, has failed to set forth a genuine issue of material fact which would support [*23] a finding that the Sheriff's Department, in administering its training and supervision, or the Board, in establishing the related policies, acted in bad faith or in a wanton or reckless manner regarding the tragic accident under consideration.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

Service: **Get by LEXSEE®**
Citation: **2000 us app lexis 498**
View: Full
Date/Time: Monday, May 24, 2004 - 4:57 PM EDT

* Signal Legend:
- ● - Warning: Negative treatment is indicated
- ⚠ - Caution: Possible negative treatment
- ◆ - Positive treatment is indicated
- ⓐ - Citing Refs. With Analysis Available
- ⓘ - Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.