IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
(Cincinnati)

| | | |
|---|---|---|
| JOEL P. MOYER, et al. | : | CASE #  1:01-CV-140 |
| | : | |
| Plaintiffs, | : | Magistrate Judge Timothy S. Hogan |
| | : | |
| v. | : | |
| | : | DEFENDANT AMBASSADOR |
| AMBASSADOR PROGRAMS, INC., et al. | : | PROGRAMS, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| | : | AND SUPPORTING |
| Defendants. | : | MEMORANDUM |

## MOTION

Per Federal Civil Rule 56, Defendant Ambassador Programs, Inc. moves for summary judgment on count 5 of Plaintiffs' third amended complaint. This motion is supported by the following memorandum and evidence adduced in discovery.

## SUPPORTING MEMORANDUM

**I.      INTRODUCTION**

This is a travel case.  Ambassador Programs, Inc. (Ambassador) organizes overseas trips, chiefly by subcontracting travel arrangements with overseas vendors as most travel companies do. Ambassador organized a trip for plaintiff Joel Moyer and other high school students in 1999. The trip participants visited the United Kingdom.  Ambassador contracted with a British travel

company to make arrangements. Ambassador communicated its guidelines to the British company, but the company did not follow the guidelines. As a result, Joel Moyer and another trip participant stayed in the home of a single male who had no kids. Joel Moyer tried to commit suicide four months after the UK trip. He says he tried to kill himself because the host male allegedly kissed and groped him for ten to twelve minutes. Whether that event really happened is a question for trial. Nevertheless, Ambassador will presume it did for summary judgment purposes only.

This case has proceeded on a negligence track for three years. However, Plaintiffs recently amended their complaint to add a claim for willful and wanton misconduct. Plaintiffs now seek punitive damages. As set forth below, this is not a willful and wanton case. Ambassador had no intent, design, or purpose to injure one of its trip participants. Ambassador exercised care toward its trip participants. It contracted with a reputable European vendor and that company's employee personally interviewed the male host in his home and determined he would be an appropriate host. The male host had no prior criminal history. Nor has he had any since the trip. There is no genuine issue of material fact. Ambassador did not act willfully or wantonly. Thus, the Court should grant Ambassador summary judgment on count 5 of Plaintiff's third amended complaint.

**II.    FACTS**

The following facts are from the discovery process and Judge Weber's February 23, 2004 summary judgment order (SJO) (Doc. # 103).

    A.    **The parties and the homestay program**

Ambassador is a for-profit corporation based in Spokane, Washington. Ambassador puts together overseas travel programs under various names. It is licensed by former defendant

People to People International (People to People) to organize trips under the trade name "People to People Student Ambassador Program." SJO at 6. People to People is a nonprofit corporation that was established by President Dwight D. Eisenhower and is being operated by his granddaughter, Mary Eisenhower. The program is designed to educate American students about foreign cultures by traveling to foreign countries and interacting with foreign nationals. SJO at 2. Part of the program involves homestays, a term coined by President Eisenhower. Eisenhower Depo. at 21. A homestay is just what the term implies. Trip participants sometimes stay at homes of foreign nationals. In this way, the participants can learn more about foreign cultures than by merely staying in commercial lodging. SJO at 3.

Because it would be far too expensive to keep a staff in every country where the program ventures, Ambassador contracts with similar travel agencies in other countries who create trip itineraries and arrange for local accommodations. Baard Depo. I at 35. In 1998, Ambassador contracted with former defendant E.I.L., Ltd. (EIL), to organize and operate a trip to the United Kingdom in the summer of 1999. SJO at 4.

Plaintiff Joel Moyer will soon enter his senior year at Indiana University. He went on the trip in the summer of 1999, shortly before he became a junior at Mariemont High School in suburban Cincinnati. Joel's parents are plaintiffs David and Marcia Moyer. Joel tried to commit suicide in the early morning hours of December 31, 1999. He did this because he alleges he was kissed and groped four months before by his Scottish homestay host, non-party Ronald Carroll. SJO at 6.

    B.    EIL's selection of Mr. Carroll

Ambassador did not select Mr. Carroll as a homestay host. Rather, former defendant EIL did. Ambassador had subcontracted with EIL to arrange homestays and supply all other travel

services for the July 1999 trip.  Ambassador gave EIL a copy of its "Guidelines for Implementation of Standards of Excellence" (Guidelines), and expected EIL would abide by those Guidelines.  SJO at 4.

Among other things, the Guidelines encourage overseas vendors to place trip participants with married couples or single adults who have kids roughly the same age as the trip participant.  Ambassador's Pamela Duckmanton twice communicated the Guidelines to EIL.  She reviewed them with EIL when EIL representatives visited Ambassador's home office in Spokane.  And she explained them to EIL representatives during a "look and see" trip to the UK in early 1999.  SJO at 4.

EIL's Frances Carney selected Mr. Carroll to serve as a homestay host.  Mrs. Carney is a lifelong Edinburgh resident.  Carney Depo. at 5.  She was unaware of Ambassador's Guidelines, as someone at EIL failed to communicate them to her.  However, she has been an EIL volunteer continuously since 1994.  *Id.* at 7.  She has served as a homestay host for the past 15 years.  *Id.* at 8.  She personally visited Mr. Carroll's home and spoke with him.  She found him to be very pleasant and noted that his house was tidy and clean.  *Id.* at 12.  In deciding whether a person would be a suitable homestay host, Mrs. Carney decides whether her own son (who is Joel's age) would be safe in the house.  She had absolutely no reservations about Mr. Carroll serving as a host.  She never thought a trip participant would be endangered, injured, or put in an unreasonable risk of harm by staying with Mr. Carroll.  *Id.* at 14 & 21.

C.  **The trip and alleged kissing and groping**

In the summer of 1999, Joel Moyer and a number of other high school students took a trip to the UK.  Joel and fellow trip participant Dan Kelley stayed with Mr. Carroll's house in

Edinburgh, Scotland for three nights.  During the second night, Joel secretly visited a pub, where broke the trip rules and his contract by drinking alcohol.[1]

The Moyers allege that Mr. Carroll offered Joel several beers after Joel returned from the pub.  Joel accepted the alleged offers, and later vomited on the living room carpet.  Joel then went into the bathroom and kneeled down over the toilet.  Mr. Carroll allegedly came in five minutes later and kissed and groped Joel for ten to twelve minutes.  Joel claims he asked Mr. Carroll to stop and Mr. Carroll did.  SJO at 7.  Mr. Carroll never threatened Joel that night or at any time during the three-night stay.  Joel Moyer Depo. at 228-29.  Joel walked into his bedroom, closed the door, and went to bed.  *Id*. at 210.  Joel did not wake fellow trip participant Daniel Kelly, who was in the bed next to his.  *Id*. at 210.  Kelley

Although the Court does not judge credibility at the summary judgment stage, it should note that Mr. Carroll emphatically denies all material parts of Joel's story.  Joel did not drink or get sick in Mr. Carroll's flat.  Carroll Depo. at 19, 25.  Mr. Carroll never made any sexual advances toward Joel.  He did not hug Joel, try to kiss Joel, stick his tongue in Joel's mouth, or grope Joel.  Carroll Depo. at 22, 24-26.  In short, Mr. Carroll emphatically denies he ever did any of the things Joel Moyer has accused him of.   SJO at 8. Dan Kelley thinks he heard some talking at some point.  Otherwise, he slept through the evening.  He never witnessed or heard any vomiting or  struggling; he did not even hear Joel get back into bed.  Kelley Depo. at  57-58.

---

[1] This was the second of three times Joel drank alcohol on the trip.  The first time he went to a pub in Ireland.  He remembers drinking something called "Orange Hooch" and Red Bull energy drink mixed with vodka.  He does not remember the other drinks they had.  Moyer Depo. at 92.  Joel testified: "We just came in stumbling, maybe some others were probably more drunk.  I never really had [that] experience, so I was just probably stumbling.  I don't know, laughing."  Joel Moyer Depo. at 95.  The participants were warned that if they drank again they would be sent home.  *Id*. at 98.  Undeterred, Joel went to a pub on the night in question and enjoyed Orange Hooch again.  *Id*. at 182.  He even drank some Budweiser the night before he returned home.  *Id*. at 244-45.

The next morning Joel and Dan Kelley woke up and went touring. Joel Moyer Depo. at 232. They spent a third night at Mr. Carroll's flat without incident. *Id*. at 236. The following morning Mr. Carroll helped Joel and Dan Kelley meet with the group.

Joel never said anything to Kelley about the incident. Joel Moyer Depo. at 238. In fact, he did not tell anybody about the alleged incident. *Id*. Nor did he tell his delegation leaders that he wanted a new homestay host. at 241. Nor did he say anything negative about Mr. Carroll to anyone on the trip. *Id*. at 242. Nor did he act any differently. Kelley Depo. at 59. In short, Joel acted as if nothing had happened.

### D.    The suicide attempt and Scottish investigation

On December 30, 1999, Joel went to the top of a three-story parking garage, sat on the ledge, and slipped himself off. Joel suffered injuries as a result of his suicide attempt. SJO at 8. Joel felt depressed because he was not accepted into the National Honor Society, because Mr. Carroll allegedly kissed and groped him, and because a female classmate didn't return his affection. *Id*. at 134, 139 & 162.

After Joel tried suicide, the matter was forwarded to Andrew Ferguson, a detective constable with the Edinburgh Police Force. Ferguson Aff. ¶¶ 2 & 4 (attached as Exh. A). Detective Ferguson conducted a detailed criminal investigation. He interviewed and eventually obtained a statement from Joel. Ferguson Aff. ¶¶ 9 & 12. He then searched the Scottish National Police computer, but Mr. Carroll had no convictions. He searched the Sexual Offenders Register, but nothing came up. He checked with Scottish criminal intelligence to see if the police had any information on Mr. Carroll, but again the search turned up nothing. In short, Mr. Carroll had a clean record. Ferguson Aff. ¶ 13; SJO at 35.

Detective Ferguson and another detective then detained Mr. Carroll. They took him to the police station and interviewed him. Ferguson Aff. ¶ 14. Mr. Carroll denied sexually assaulting Joel Moyer or any other person who stayed with him. Ferguson Aff. ¶ 15. Because there was no evidence supporting Joel's allegation, Mr. Carroll was released and never charged. Ferguson Aff. ¶¶ 16-17. Mr. Carroll has always denied the Moyers' allegations. Carroll Depo. at 19, 22 & 24-26.

**E.     The lawsuit**

The Moyers later sued, claiming Ambassador was responsible for Joel's suicide attempt. They claim that Ambassador should be held liable for Mr. Carroll's alleged criminal activity. They also sued EIL, but EIL was dismissed for lack of personal jurisdiction. Order Granting EIL's Motion to Dismiss (Doc. #53). They also sued People to People, but People to People was granted summary judgment. Judge Weber failed "to perceive how People to People could be held liable under an apparent agency theory based on the evidence plaintiffs have presented." SJO at 24. The Moyers have never sued Mr. Carroll – either in Scotland or in the United States. SJO at 8.

The Moyers recently amended their complaint to add a claim of willful and wanton misconduct against Ambassador. In granting their motion to amend, Judge Weber held that Ambassador could seek summary judgment on the new claim. Order Granting Leave to Amend (Doc. #114). Thus, this motion seeks summary judgment on the willful and wanton misconduct claim. Ambassador did not act in that manner and the Moyers are not entitled to punitive damages.

### III. THE COURT SHOULD GRANT AMBASSADOR SUMMARY JUDGMENT ON COUNT 5 OF PLAINTIFFS' THIRD AMENDED COMPLAINT

#### A. Ambassador committed no willful or wanton misconduct

Willful conduct "involves an intent, purpose or design to injure." *Clutter v. Karshner*, 2001 U.S. App. Lexis 19094 at *10, n. 3 (6th Cir.) (attached as Exh. B) (quoting *Glandon v. Greater Cleveland Regional Transit Authority*, 75 Ohio St. 3d 312, 662 N.E.2d 287, 293 (1996)).

Wanton misconduct is a failure to use *any care* under conditions that in *all probability* will result in injury." *Justice v. Marion County Sheriff's Department*, 2000 U.S. App. Lexis 498 at *18-19 (6th Cir.) (attached as Exh. C).

The Sixth Circuit and other courts have granted a defendant summary judgment because the plaintiff could not meet the high burden of showing willful and wanton misconduct. In each case, the court held the defendant acted negligently at best. *Clutter*, 2001 U.S. Lexis 19094 at *12-13 (race track operator did not put rail system around track despite several prior accidents); *Justice*, 2000 U.S. App. Lexis 498 at *18-19 (deputy drank alcohol and left loaded gun on kitchen counter); *Evans v. Ohio State University*, 112 Ohio App.3d 724, 749, 680 N.E.2d 161, 177 (1996) (county extension officer failed to disclose to 4-H advisors that goat expert whom extension office had hired as fair judge had prior conviction for gross sexual imposition and corruption of a minor).

Here, Ambassador and EIL obviously had no intent, purpose or design to injure Joel. Ambassador exercised and met its duty of care to Joel Moyer. Ambassador's Pamela Duckmanton twice communicated Ambassador's Guidelines to EIL. Thus, Ambassador expected that EIL would follow the Guidelines. SJO at 4.

EIL's Frances Carney met with Mr. Carroll in his home and determined he would be a suitable host. Mr. Carroll had previously hosted eight to ten trip participants without incident.

SJO at 5; Carroll Depo. at 11.  Mrs. Carney would have let her own son (who is Joel's age) stay with Mr. Carroll.  Mrs. Carney had no reservations about Mr. Carroll serving as a host.  She never thought a trip participant would be endangered, injured, or put in an unreasonable risk of harm by staying with Mr. Carroll.  Carney Depo. at 14 & 21.

After one of Ambassador's delegation leaders (or chaperone) found out that EIL had selected Mr. Carroll to serve as a host for Joel Moyer and another trip participant, she asked them whether they would be comfortable with that arrangement.  They were and elected to stay with him.  The delegation leader then told them to call her at any time if they felt uncomfortable.  She would arrange for a taxi to get them and they would make new arrangements.  SJO at 6.  They never complained about Mr. Carroll.  Joel Moyer Depo. at 241.  In fact, Joel never said anything negative about Mr. Carroll to anyone on the trip.  *Id*. at 242.

Also, just because Mr. Carroll was single and had no kids does not mean "in all probability" Joel would be injured.  A married female or married male could have kissed and groped Joel.  Despite what the Moyers implicitly argue, not all single males are sexual deviants.  Most important, unlike the perpetrator in *Evans*, Mr. Carroll had (and still has) no criminal record.  If the defendants weren't liable in *Evans*, then Ambassador certainly can't be liable here.  Ambassador or EIL did not act willfully or wantonly.  The Court should award Ambassador on count 5 of Plaintiffs' third amended complaint[2]

### B.    The Moyers are not entitled to punitive damages

In Ohio, a plaintiff is not entitled to punitive damages unless he or she proves by clear and convincing evidence that the defendant acted maliciously, with ill will, in bad faith, or in reckless disregard for the rights and safety of others.  Ohio Rev. Code § 2315.21(C)(2).  As

---

[2] The Moyers also allege that Ambassador acted recklessly.  The Ohio Supreme Court equates "reckless" with "willful" and "wanton."  *Thompson v. McNeil*, 53 Ohio St.3d 102, 104, 559 N.E.2d 705, 708, n. 1 (1990).

noted above, Ambassador is entitled to summary judgment on the Moyers' proposed willful/wanton misconduct claim. They likewise would be entitled to summary judgment on the punitive damages issues – even without considering the elevated burden of proof required by Ohio law.

### IV.    CONCLUSION

Ambassador concedes, in light of Judge Weber's summary judgment order, that there is an issue of fact whether Ambassador or EIL was negligent. However, there is absolutely no issue whether Ambassador acted willfully or wantonly. It didn't. The Court should grant Ambassador summary judgment on Plaintiffs' claim for willful and wanton misconduct (count 5) and on their request for punitive damages.

Respectfully submitted,

s/ Martin A. Beyer
Martin A. Beyer (Trial Attorney) (0060078)
Robert G. Hanseman  (0071825)
Sebaly Shillito + Dyer
A Legal Professional Association
1900 Kettering Tower
Dayton, OH 45423
937/222-2500
937/222-6554 (fax)
mbeyer@ssdlaw.com
Attorneys for Defendant Ambassador Programs, Inc.

## **CERTIFICATE OF SERVICE**

      I certify that a copy of **Defendant Ambassador Programs, Inc.'s Motion for Partial Summary Judgment** was served electronically and via U.S. mail to:

Louis F. Gilligan, Esq.
Peter J. Stautberg, Esq.
Keating, Muething & Klekamp, PLL
1400 Provident Tower
One East Fourth Street
Cincinnati, OH 45202
513/579-6400
Attorneys for Plaintiffs

and via U.S. mail to:

Gregory G. Beck, Esq.
KREINER & PETERS CO. L.P.A.
2055 Reading Road, Ste. 290
Cincinnati, OH 45202
(513) 241-7878
Attorney for Defendant Humana/Choice

on June 23, 2004.

                                                        s/ Martin A. Beyer
                                                        Martin A. Beyer