## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **JOEL P. MOYER** | ) | **Case No. 1:01-CV-140** |
| | ) | |
| **Plaintiffs,** | ) | **(Magistrate Judge Hogan)** |
| | ) | |
| **-v-** | ) | **PLAINTIFFS' MEMORANDUM IN** |
| | ) | **OPPOSITION TO DEFENDANT** |
| **PEOPLE TO PEOPLE INTERNATIONAL,** | ) | **AMBASSADOR PROGRAMS, INC.'S** |
| **INC., et al.,** | ) | **MOTION FOR PARTIAL SUMMARY** |
| | ) | **JUDGMENT** |
| **Defendants.** | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| | ) | |
| | ) | |

## I.    INTRODUCTION

From the outset of its Motion for Partial Summary Judgment, Defendant Ambassador
shows the same callous attitude and conscious disregard for others upon which Plaintiffs' claim
for punitive damages is based. Ambassador's opening contention that this is merely a "travel
case" demonstrates Ambassador's attitude toward their responsibilities. This contention has
been thoroughly refuted by the evidence of record in this case, including the testimony of its own
employees.

In fact, Judge Weber disagreed that this is merely a "travel case," and found "defendants'
attempt to liken this case to cases in which the courts have found tour operators not liable for
actions of third-party suppliers they do not own, operate or control to be unavailing." (*See
Order[1]* dated February 23, 2004, p. 19). Judge Weber found, inter alia, that Ambassador took

---

[1] Judge Weber's Order, dated February 23, 2004, Doc  ("Order"), was a ruling on the parties' cross-
motions for summary judgment. In that Order, Judge Weber made many findings of fact and conclusions
of law which are important to the considerations of Ambassador's pending motion for partial summary
judgment. References to the Order's Findings of Fact are designated "Order ¶__".

custody of the children on its trip, and owed them a duty of reasonable care to protect them from an unreasonable risk of harm, including criminal acts of third parties. (*See generally* Order).

The basic premise of Ambassador's motion is that they could not have acted with malice in Joel Moyer's homestay placement, because they had no idea where or with whom Joel was being placed. This argument fails because Ambassador is responsible and liable for the actions and inactions of EIL Ltd. Judge Weber ruled that "Ambassador may be held liable for acts and omissions of E.I.L. relating to homestay placements." (Order p. 22) Therefore, Ambassador is responsible and liable for the acts of the company at which it is pointing the finger.

Judge Weber's Order thoroughly addresses many of the same threshold arguments raised by Ambassador in its pending motion for partial summary judgment. The findings of fact in Judge Weber's Order, standing alone, are sufficient to create an issue of fact regarding whether Ambassador acted with "malice" so as to justify the imposition of punitive damages, and these are incorporated by reference. Nevertheless, additional evidence of record in the depositions on file with the Court further demonstrate the facts supporting Plaintiffs' claims.

## II.    PROCEDURAL POSTURE

This is a personal injury case involving claims arising out of a sexual assault Plaintiff Joel Moyer suffered at the hands of a "homestay host" while participating in a foreign travel program for children to the Ireland and the United Kingdom in 1999. The parties filed cross-motions for summary judgment in the Summer of 2003. The cross-motions for summary judgment concerned many issues of law regarding the duties owed by Ambassador, and the agency relationship of former defendant EIL, Ltd.[2]

Judge Weber issued his Order on the cross-motions for summary judgment in February, 2004. During the pendency of the motions, and subsequent to Judge Weber's decision,

---

[2] EIL Ltd. was dismissed early in this case on the basis of personal jurisdiction.

additional depositions were taken.  Subsequently, Plaintiffs' moved for and were granted leave to amend their complaint to include a claim for punitive damages.

## III.    STATEMENT OF FACTS

### A.    Background

Joel Moyer was a participant on a People to People Student Ambassador Program trip to England, Ireland, and Scotland in July 1999.  (Joel Moyer Depo. Ex. 3; Baard Depo. I (8/23/01) pp. 65-67; Baard Depo. I Ex. 6; Ransenberg Depo. pp. 10-11; 75).  Defendant Ambassador organized the trip to take children to these foreign countries, and place them for overnight stays in the homes of strangers.  (Order ¶ 7).

### B.    Knowledge and Representations By Ambassador Concerning the Necessity of Care and Safety

Ambassador represented in its brochures that it carefully selected the homestay hosts to ensure the children would be safe.  (Moore-Critchlow Depo. pp. 95-96).  Parents had a right to rely on this representation.  (Order ¶ 23).  Indeed, if a family would ask about the entity making arrangements overseas, Ambassador representatives would tell them that Ambassador takes the responsibility.  (Moore-Critchlow Depo. p. 54).

Ambassador and its employees were well aware of the importance that parents placed on the safety of their children.  Ambassador  knew and understood that they had to protect the children in their custody, and keep them out of harm's way.  Ambassador knew and understood that it was important to place the children over whom it had custody and control in a place that was most safe.  (Order ¶¶ 19-22).  Ambassador also knew and understood that parents had a right to rely on Ambassador's representations in their brochures concerning homestays. (Order ¶19; Baard Depo. II (7/31/02) p. 81).

**C.    Ambassador Tries to Delegate Its Non-delegable Duty**

Judge Weber already ruled that Ambassador owed a duty to use reasonable care to protect program participants from unreasonable risk of harm, and that this was a non-delegable duty. (Order p. 22).  Nevertheless, after having assured the participants and their families that family homestays were to be part of the benefits that Ambassador was going to bestow upon Joel Moyer as part of the Student Ambassador Program; Ambassador proceeded, without notice or approval of the participants or their families, to contract out part of the responsibility for homestay placements to EIL Ltd.  (Moore-Critchlow Depo pp. 47-48, 73). (Baard Depo. II (7/31/02) p. 81, Baard Depo. I (8/23/01) p. 74).  Indeed, Ambassador has never actually made the arrangements for homestays on its overseas trips. (Order ¶ 10; Baard Depo. II pp. 95-96).

Despite making such representations regarding the careful selection of homestay families, the trip participants and their families are not told of the involvement of the third party, EIL Ltd., in designating the homestay hosts with whom the program participants would be staying. Ambassador purposefully concealed this based on its determination that telling trip participants and their families that information would create confusion in the marketplace.  (Baard Depo. I, 8/23/2001 p. 74).

**D.    The Homestay Placement with a Single Male Violates Ambassador's Policies and Promises**

Ambassador concedes that placing Joel Moyer in a homestay where the host was a single man, with no children was not in compliance with the Standards of Excellence.  (Baard Depo. II, p. 73).  Diane Moore-Critchlow, another of Ambassador's own employees, confirmed that placing a participant with a single male with no family was outside of any possible scenarios presented by Ambassador to prospective families.  She further recognized that families were not likely to sign up for the program had such a possibility been known in advance.  (Moore-

Critchlow Depo. pp. 55-56). One of the chaperones for the trip, Catherine Ransenberg, was "very upset" when she learned, on the bus ride to Edinburgh, that Joel Moyer was designated to stay with a single male. (Ransenberg Depo. p. 63). Mrs. Ransenberg further testified:

> I told Chris that I felt extremely uncomfortable having these boys stay with a single man when I knew nothing like that, and I realized that sounded very prejudicial on my part, but I didn't feel like this met with People to People's expectations that students would be staying with a parent with children, a family as I define it.

(Ransenberg Depo. p. 63).

### E.    Ambassador is Responsible for EIL Ltd.'s Actions and Inactions

EIL Ltd.'s representative, Francis Carney, made a conscious decision to accept Mr. Carroll as a homestay host, knowing full well that he was a single male with no children.

Judge Weber already determined that EIL Ltd. is the agent for Ambassador, and that Ambassador may be held liable for EIL Ltd.'s acts and omissions. (Order p. 22). With the actions of Ms. Carney imputed to Ambassador, and with Mrs. Ransenberg's knowledge of the situation, Ambassador cannot deny its responsibility for placing Joel Moyer in the home of a single male, in clear violation of their Standards of Excellence, and in defiance of common sense.

### F.    Problems in Securing Suitable Homestays

Mr. Carroll was chosen as a homestay host after responding to a newspaper advertisement dated June 17, 1999. (Carney Depo. p. 10). This is less than two weeks before the program participants were departing for the UK, and about one month before Joel Moyer was to arrive in Edinburgh. Ms. Carney, the local representative for EIL Ltd. in Edinburgh recalls:

> I knew there was going to be difficulties with hosting students in July. I expressed this to EIL when I was asked if I could do the group. I knew that I didn't have enough families at the time. . . .

> "[I]t was very difficult to get host families at that time so it was
> agreed that they would advertise in a newspaper for extra host
> families."

(Carney Depo. p. 10).

Mr. Carroll recalls hearing of his acceptance as a homestay host about one week before

the delegation arrived in Edinburgh.  (Carroll Depo. p. 55).  In fact, the arrangements were

initially for Mr. Carroll to take only one student, and then he was asked to take on a second

program participant about two days before their arrival.  (Carroll Depo. pp. 55-56).

### G.    Ambassador Failed to Properly Investigate and Follow-Up

Although Ambassador portrays its relationship with EIL, Ltd. as rock solid and one in

which they placed full faith, the relationship was built upon a flimsy set of circumstances, an oral

agreement, and was riddled with miscommunications.  First, Ambassador did little, if any,

investigation into the reputation of EIL Ltd.  Ms. Pamela Duckmanton was the program

specialist responsible for putting the program together at Ambassador.  She was new to the

business and had never heard of EIL prior to meeting representatives from EIL Ireland and EIL

Ltd. in October 1998. (Duckmanton Discovery Depo. p. 9).  Ms. Duckmanton did not investigate

EIL Ltd. prior to its selection as a supplier in the Fall of 1998.  (Duckmanton Discovery Depo.

pp. 8-9).

There was no written contract in place specifying the terms of any agreement.  Rather,

Ambassador provided EIL Ltd. with its "Standards of Excellence," by which Ambassador

expected EIL Ltd to comply. (Order ¶ 12).  The guidelines provide that the program participants

are to be placed with "families" consisting of married couples of single parents with children

roughly the same age.  (Order ¶14).  The guidelines also provided that the entity making the

homestay arrangements, EIL in this case, was to supply the names, addresses, and names of

children of the respective host families thirty days in advance of the scheduled departure. (Duckmanton Depo. p. 19).

In approximately January 1999, Ms. Duckmanton took a trip to the Great Britain and Ireland to see the sites for herself. (Duckmanton Discovery Depo. p. 10). However, Ms. Duckmanton visited with EIL Ireland on that trip. (Duckmanton Discovery Depo. p. 10). There are two separate companies in the UK using the EIL name - - EIL in Ireland, and EIL Ltd. (located in Worcester, England). (Baard Depo. I, 8/23/01), pp. 15-16). Ms. Duckmanton was not aware of the fact that there were two separate companies. (Duckmanton Perpetuation Depo. p. 12).

On her trip in January, 1999, Ms. Duckmanton only visited and spoke with the EIL Ireland office in Cork. (Duckmanton Discovery Depo. pp. 10-11). Ms. Duckmanton did not visit with or speak to anyone from the EIL Ltd. office in Worcester, England. (Duckmanton Discovery Depo. pp. 10-11). All of Ambassador's discussion and argument about Ms. Duckmanton's January 1999 trip must be viewed in light of the fact that she visited with and communicated only with the EIL office in Cork, Ireland, which is an entirely separate organization from the EIL Ltd. It was the EIL Ltd. office that was responsible for the Edinburgh, Scotland part of the trip in question.

## IV.    ARGUMENT

### A.    The Standard for Summary Judgment.

Summary judgment may be granted where there are "no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A "genuine issue" of material fact exists when the nonmoving party makes a

sufficient showing to establish an essential element to that party's case, and on which that party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23. "A mere scintilla of evidence is insufficient; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 622 (6th Cir. 2000) (quoting *Anderson*, 477 U.S. at 252). The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).

In this case, there is sufficient evidence of record for a jury to reasonably conclude that Ambassador, by itself and through its representatives and agents, acted with "malice," as that term is defined in R.C. 2315.21. Ambassador's Motion for Partial Summary Judgment must be denied.

### B. Plaintiffs Have Demonstrated Sufficient Facts to Support Punitive Damages

The Ohio Revised Code provides the specific circumstances in which punitive damages are recoverable in an action sounding in tort:

(B) Subject to division (D) of this section, punitive or exemplary damages are not recoverable from a defendant in question in a tort action unless both of the following apply:

(1) The actions or omissions of that defendant demonstrate malice, aggravated or egregious fraud, oppression, or insult, or that defendant as principal or master authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate.

(2) The plaintiff in question has adduced proof of actual damages that resulted from actions or omissions as described in division (B)(1) of this section.

R.C. § 2315.21(B). Ambassador has moved this Court for partial summary judgment, asserting that Plaintiffs cannot satisfy section (B)(1) of the statute.

Ohio case law has defined "malice," as used in section (B)(1), as follows: (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other person that has a great probability of causing substantial harm. *Malone v. Courtyard by Marriott Limited Partnership* (1996), 74 Ohio St.3d 440, 445-446.

In *Doe v. White* (Montgomery Co. 1994), 97 Ohio.App.3d 585, 647 N.E.2d 198, punitive damages were upheld against a crisis hotline counselor who used his position of trust to entice a hotline caller to have consensual sex. The Court found that there was sufficient evidence that the counselor's actions demonstrated a conscious disregard for the rights and safety of the caller when the counselor was well aware of the caller's fragile mental condition. The Court found that there was also a great probability that this action would cause substantial harm:

> The evidence is sufficient to allow the trier of fact to conclude that a sexual encounter between a counselor and client at the counselor's suggestion, while the client is in a fragile mental state, which occurred within a short time period of the client's telephoning a crisis hotline for help, causes a great probability of substantial harm to the client. As there is sufficient evidence in the record to support the trial court's finding, we cannot say that this finding was erroneous.

*Id.* at 592, 647 N.E.2d at 203.

It is well settled that malice may also be inferred from "reckless, wanton, willful or gross" behavior. In *Cabe v. Lunich* (1994), 70 Ohio St.3d 598, 640 N.E.2d 159, the Court found that evidence of drunk driving was sufficient to have the jury consider whether such reckless behavior supported a finding of punitive damages:

> We are convinced that the conduct of drinking and driving may well, under the circumstances of each individual case, constitute the kind of reckless, outrageous behavior justifying a jury to conclude that the defendant possessed a willful indifference to the rights and safety of others justifying an award of punitive damages.

*Id.* at 602, 640 N.E.2d at 162-163.

Malice was also inferred from reckless conduct in *Wilkins v. Ondrovich*, (12th Dist. 1997), 118 Ohio App. 3d 93, 691 N.E.2d 1122.  In *Wilkins*, a real estate broker coerced an individual, known to be in a fragile mental state, to enter into a contract to sell her home for less than its value.  The Court found that this conduct was "extremely reckless," thereby justifying punitive damages. *Id.*

In *Barker v. Netcare Corp.*, (Franklin Co. 2001), 147 Ohio App.3d 1, 768 N.E.2d 698, the Court addressed the propriety of punitive damages where a mental health patient was drugged and restrained from leaving the premises.  The Court found that under the circumstances presented, "there is evidence to support the jury verdict that appellants acted with a conscious disregard for the rights and safety of Barker that had a great probability of causing substantial harm and can be characterized as reckless, wanton, willful, or gross." *Id.* at 16, 768 N.E.2d 710. *See also Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 37, 543 N.E.2d 464, 467 (malice found where behavior in holding a car until the debt of a daughter was paid was reckless).

C.    **Ambassador's Willful Indifference Toward Joel's Homestay Placement, Combined with its Misrepresentations to Joel's Parents Regarding His Homestay Arrangements, Show Conscious Disregard for Joel's Rights and Safety Sufficient to Satisfy the Punitive Damages Statute.**

The actions and inactions of Ambassador, and its agents and representatives, clearly evidence reckless behavior, and a conscious disregard for the Joel's rights and safety, which has a great probability of causing substantial harm.  The Moyers do not contend that Ambassador acted with hatred, ill will, or a spirit of revenge toward Joel.  However, there is plenty of evidence to support a finding that Ambassador acted with recklessness, and a conscious disregard for Joel's safety in this case.

- 11 -

First, Ambassador contracted with a foreign company to provide services in arranging homestays. As Judge Weber already ruled, this is a non-delegable duty. Ambassador did nothing to detect problems that should have been found, or follow up to ensure that Ambassador was satisfying its duty.

Ambassador argues that Pamela Duckmanton went on a trip to visit with EIL. However, in fact, Ms. Duckmanton visited with representatives of EIL Ireland. Ms. Duckmanton was not even aware that there were two separate EIL organizations. Ms. Duckmanton did not communicate with anyone from EIL Ltd. in Worcester, England. It is also obvious that Ms. Duckmanton had no communication with Francis Carney, EIL Ltd.'s representative in Edinburgh, who had no knowledge of Ambassador's guidelines on homestays.

The Ambassador Standards of Excellence clearly require detailed information regarding homestays be provided to Ambassador's office thirty days prior to departure of the trip participants. This could not possibly have been provided with respect to Edinburgh homestay because EIL Ltd. was advertising for homestay hosts less that two weeks before departure. Moreover, Ronald Carroll was engaged to be a homestay host about a week prior to the arrival in Edinburgh. At that time, the participants were already on their trip. Ms. Carney readily admits there was great difficulty in finding homestay hosts. Had Ambassador enforced the very plain requirements of its Standards of Excellence, Ambassador would have seen that (1) EIL Ltd. was deficient in its attempt to secure homestays; and/or (2) EIL Ltd. made arrangements for a homestay with a single male, in violation of the Ambassador Standards of Excellence and its policies. All Ambassador had to do was check-up on and enforce their own rules. Ambassador's failure to do so was reckless, and demonstrates a conscious disregard for the rights and safety of Joel Moyer that has a great probability of causing substantial harm.

### D.     Ambassador is Responsible and Liable for the Actions and Inactions of its Agent, EIL Ltd.

Notwithstanding the strong support for punitive damages in the foregoing, further evidence of malice can be inferred by the conduct of EIL Ltd., when appropriately viewed as Ambassador's agent.   Ambassador argues that Ms. Carney made an innocent and unknowing mistake.   However, Judge Weber has already ruled that Ambassador may be held liable for the actions and inactions of EIL Ltd. (Order p. 22).  Ms. Carney's failure to make an appropriate homestay placement is imputed to Ambassador.   When appropriately viewed, Ambassador's own agent violated its own rules, policies, and promises with respect to homestays.   The failure of EIL Ltd. to transmit the Standards for Excellence, or the homestay requirements therein, is also imputed to Ambassador.   Ambassador cannot hide from the actions, inactions, and missteps of Ms. Carney and EIL Ltd. in this case.

### E.     The Last Clear Chance

Finally, conveniently ignored by Ambassador is the fact that its own chaperone traveling with the group, Catherine Ransenberg, was well aware of the homestay arrangements with Ronald Carroll.   Mrs. Ransenberg knew that a homestay with a single male was not appropriate, and she was justifiably "very upset."   Nevertheless, despite being very upset, and knowing that the placement was not appropriate, Mrs. Ransenberg allowed the arrangements to stand.   Mrs. Ransenberg was told that there were no alternative arrangements.   That does not excuse the fact that she allowed Joel Moyer to be placed in harm's way.

### F.     Whether Ambassador showed a "conscious disregard" for Joel's safety is an issue of fact to be determined by the jury.

Ultimately, the determination of whether the actions and inactions of Ambassador and its agents evidence malice is a question to be resolved by the finder of fact. Certainly, a reasonable person could conclude allowing a child to be placed with an unknown single male in a foreign

country, without a thorough inquiry into the suitability of the person as an overnight host, shows a conscious disregard for the rights and safety of the child, and places the child in a situation where substantial harm is probable.  Ms. Carney's interview notwithstanding, the placement shocks the sensibilities, and is a clear violation of Ambassador's own policies and promises. Accordingly, this factual issue must be resolved in the Moyer's favor and the motion for partial summary judgment must be denied.

## V.    CONCLUSION

Summary Judgment in favor of Ambassador on Plaintiffs' claim for punitive damages is not appropriate here.  The evidence of record clearly shows that despite Ambassador's representation to the parents regarding the careful selection of homestays, Ambassador did nothing to know or understand with whom the children in their custody would be placed.  The actions of Ambassador's agent in placing Joel Moyer in such a situation is also imputed to Ambassador.  These facts strongly support the imposition of punitive damages, and Ambassador's Motion for Partial Summary Judgment should be denied.

Respectfully submitted,


_/s/  Peter J. Stautberg_____
Louis F. Gilligan (0021805)
Peter J. Stautberg (0061691)
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio 45202
Tel: (513) 579-6522
Fax: (513) 579-6457
lgilligan@kmklaw.com
pstautberg@kmklaw.com
Attorneys for Plaintiffs,
Joel P. Moyer, et. al.,

OF COUNSEL:

KEATING, MUETHING & KLEKAMP, P.L.L.
1400 Provident Tower
One East Fourth Street
Cincinnati, Ohio 45202
(513) 579-6400

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a copy of the foregoing PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT AMBASSADOR PROGRAM, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT was serve this 26 day of July, 2004 by electronic mail upon:

Robert Hanseman, Esq.
Martin Beyer, Esq.
Sebaly, Shillito, and Dyer
1900 Kettering Tower
Dayton, Ohio  45423
Attorneys for Defendant Ambassador Programs, Inc.

Gregory G. Beck, Esq.
Kreiner & Peters
P.O. Box 1209
Dublin, Ohio  43107
Attorneys for ChoiceCare

    /s/ Peter J. Stautberg

1308586.1