UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Joel P. Moyer, et al.,
    Plaintiffs

    vs                                          Case No. C-1-01-140

People to People
International, Inc., et al.,                    **ORDER**
    Defendants                          (Hogan, M.J.)

This matter is before the Court on defendant Ambassador Programs, Inc. (Ambassador)'s motion for partial summary judgment on count 5 of plaintiffs' third amended complaint (Doc. 120), plaintiffs' memorandum in opposition (Doc. 123), and Ambassador's reply memorandum. (Doc. 128). The parties have consented to final judgment by the Magistrate Judge in this matter.

Count 5 of plaintiffs' third amended complaint alleges that Ambassador's breaches of duties were reckless, willful, wanton, and done with malice, insult, oppression, and/or a conscious disregard for the rights of plaintiffs that has a great probability of causing substantial harm. (Doc. 115 at ¶80). Plaintiffs' fifth claim seeks punitive damages against Ambassador. Ambassador seeks partial summary judgment on this claim, arguing it did not act willfully or wantonly in this matter and that plaintiffs are not entitled to punitive damages. For the reasons that follow, Ambassador's motion for partial summary judgment is **DENIED**.

The undisputed facts taken from Judge Weber's Order of February 23, 2004 (Doc. 103) are as follows:

1. Plaintiffs Joel P. Moyer and his parents, David M. Moyer and Marcia G. Moyer, are residents of Ohio.

2. Joel was born on September 7, 1982. He is presently a student at Indiana University, where he has earned excellent grades.

3. David Moyer is a practicing attorney. Marcia Boyer is a bookkeeper for various clients. She has a bachelor's degree in psychology.

4. People to People is a non-profit corporation that was established by President Dwight D. Eisenhower. The corporation fosters international understanding, in part through educational travel programs for American students. People to People is based in Kansas City and has one-person satellite offices in Boston and Berlin.

5. Ambassador is a for-profit corporation based in Spokane, Washington. Ambassador puts together overseas travel programs under various names.

6. People to People contracts with Ambassador. Ambassador is licensed by People to People to organize trips under the trade name "People to People Student Ambassador Program" (Program). The Program is a People to People program which is operated by Ambassador. The Program is designed to educate American students about foreign cultures by providing students with the opportunity to travel to foreign countries and interact with foreign nationals.

7. Part of the Program involves homestays, a term for trip participants' stays at homes of foreign nationals. Through homestays, participants can learn more about foreign cultures than by merely staying in commercial lodging.

8. In the fall of 1998, Joel received a letter from a teacher at his high school about the Program. Joel and his mother attended an information meeting where Ambassador's Diane Moore-Critchlow spoke. She talked about the Program and the upcoming 1999 United Kingdom trip. After the meeting, Joel and his parents signed and read Ambassador's Application and Conditions of Program. Joel was sixteen years old when he applied to participate in the Program and at the time of the 1999 trip.

9. Over the next few months, Joel and/or his parents attended periodic meetings about the trip. Trip participants were given materials about the trip and the places they would visit. The participants, including Joel, were specifically instructed not to drink any alcoholic beverages, even if they were legally old enough to drink in the foreign countries. Joel also signed a written contract with Ambassador pursuant to which he promised not to drink alcohol during the trip.

10. Ambassador has never made the actual arrangements for homestays on its United

Kingdom trips.

11. E.I.L. is a European non-profit educational exchange organization that, among other things, investigates and selects homestay hosts. Ambassador contracted with E.I.L. to arrange homestays and supply travel services on the July 1999 United Kingdom Program trip.

12. There was no signed contract between Ambassador and E.I.L. Rather, Ambassador provided E.I.L. with Ambassador's written "Guidelines for Implementation of Standards of Excellence" (Guidelines), by which standards Ambassador expected E.I.L. to abide in fulfilling the Program requirements.

13. Ambassador did not tell Program participants or their families that there would be a separate organization making arrangements for the homestays in the United Kingdom, believing this information would create confusion in the marketplace.

14. In the fall of 1998, E.I.L. representatives visited Ambassador's headquarters in Spokane, Washington. Ambassador's Pamela Duckmanton reviewed Ambassador's Guidelines with the E.I.L. representatives. Those Guidelines, among other things, encourage overseas vendors to place travelers with "host families", that is, with married couples or with single adults who have children roughly the same age as the trip participant.

15. Ambassador sent Ms. Duckmanton on a "look and see" trip to the United Kingdom in early 1999. She traveled to the destination spots and met with E.I.L. representatives. She again explained Ambassador's Guidelines regarding homestays.

16. Regarding the trip participants' stay in Edinburgh, Scotland, E.I.L. placed an ad in the local newspaper for homestay hosts. Mr. Ron Carroll responded to the ad and later filled out an application. The E.I.L. homestay coordinator personally interviewed Mr. Carroll in his flat and determined that he would be a suitable homestay host. Mr. Carroll had started hosting people in 1997 and had hosted a total of eight to ten people.

17. There were three chaperones, known as Delegation Leaders, on the July 1999 Program trip. They were Cathy Ransenberg, Donald Ransenberg and Genese Leftkowitz. The chaperones represented Ambassador. The chaperones are provided a free trip in exchange for their services as chaperones.

18. Delegation Leaders act as chaperones on the trip. They are in charge and are responsible for the well-being of the students.

19. Safety on its programs is a paramount concern for Ambassador, and the safety and welfare of the students was the first and foremost concern of the Delegation Leaders/chaperones. Ambassador was cognizant that the children had to be protected. Ambassador expected its customers to rely on its emphasis on safety.

20. Ambassador established "security nets" through communication procedures with chaperones.

21. Ambassador and its chaperones took custody of the children on the Program.

22. Ambassador believed it was important to ensure the safety of children on its programs and keep the children out of harm's way. Part of the concept of keeping minor children out of harm's way during a homestay would be to place them in a situation that would be the most safe.

23. The Moyer family had a right to expect that the homestays in which Joel was placed were reflective of the information placed in the Program brochures.

24. Joel and the other members of his delegation departed from the United States in July 1999. They had three homestays on their trip in Worcester, England; Killarney, Ireland; and Edinburgh, Scotland. Before each homestay, the Delegation Leader gave each participant a handout listing where each participant would be staying and a phone number where she could be contacted if any problems arose.

25. Ms. Ransenberg was aware that Joel and another student had been designated to stay with
a single male in Edinburgh. Ms. Ransenberg expressed concern about the arrangements.

26. On the bus ride to Edinburgh, Ms. Ransenberg told Joel and fellow trip participant Dan Kelley that Mr. Carroll would be their homestay host. Ms. Ransenberg asked them if they were uncomfortable with that arrangement. She told them that they could call her at any time if they felt uncomfortable staying with Mr. Carroll and she would send a taxi to pick them up and they could stay with her.

27. Early in the trip, Ms. Ransenberg became so concerned about the arrangements made by E.I.L. that she called an emergency number for Ambassador in the United States and demanded attention.

28. Joel and Dan Kelley stayed at Mr. Carroll's flat in Edinburgh for three nights. The first night was uneventful. The second night in Edinburgh, Joel and some other trip participants went to a pub where Joel consumed alcohol. Joel alleges that he was "buzzy" and a "little light-headed." This was the second time Joel had consumed alcohol on the trip. The first time, which was in Ireland, he was disciplined and told that he would be sent home if he did it again.

29. Joel alleges that the following series of events occurred after he left the pub. Joel went back to Mr. Carroll's flat and talked with him for three hours. Mr. Carroll offered him some beer. Joel accepted and drank four or five beers. Joel eventually became sick and vomited on the living room carpet. He went into the bathroom and kneeled over the toilet.

Mr. Carroll came in about five minutes later. He put his arms around Joel, kissed Joel by putting his tongue in Joel's mouth, felt up Joel's shirt, and groped Joel's penis on the outside of Joel's boxer shorts. This lasted for ten to twelve minutes. Joel eventually asked Mr. Carroll to stop, and he did. Joel walked into his bedroom, closed the door, and went to bed. Joel did not wake Daniel Kelley, who was in the bed next to his.

30. Dan Kelley thinks he heard some talking at one point during the night of the alleged assault, but otherwise he slept though the night.

31. Joel and Dan Kelly spent the next night at Mr. Carroll's flat without incident.

32. After returning to the United States, Joel began school.

33. In the late evening hours of December 30, 1999, Joel wrote a suicide note which he left in
his bedroom. He wrote a separate letter to a student at school for whom he had developed a romantic attachment. He enclosed $200.00 with that letter and deposited it in a mailbox in the early morning hours of December 31. Joel then drove to the top of a three-story parking garage, sat on the ledge, and slipped himself off.

34. Joel landed on a grassy hill and fell to the bottom. He was found by a police officer and immediately taken to the hospital. He underwent three surgeries and began a lengthy physical and mental recovery.

35. Shortly after the suicide attempt, Mr. Moyer wrote Ambassador's Ralph Baird, who then contacted E.I.L. The matter was forwarded to the Edinburgh Police Force, which conducted a detailed criminal investigation. The investigation disclosed that Mr. Carroll had a clean record. Mr. Carroll denied sexually assaulting Joel. The Moyers elected not to pursue Mr. Carroll in Scotland.

(Doc. 103 at 2-8).

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Under Federal Rule of Civil Procedure 56(c), a grant of summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002). The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Satterfield,* 295 F.3d at 615; *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enterprises, Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

Summary judgment "will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. The Court's function is not to weigh the evidence; its duty is to determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252; *Little Caesar*, 219 F.3d at 551.

Punitive damages may be awarded where the plaintiff proves actual damages and the defendant's actions demonstrate malice, oppression, fraud, or insult. Ohio Rev. Code § 2315.21(B)(1). Since section 2315.21 does not provide its own definition of "malice," the Ohio courts apply the definition first set forth in *Preston v. Murty*, 32 Ohio St.3d 334, 512 N.E.2d 1174 (1987). *See Malone v. Courtyard by Marriott L.P.*, 74 Ohio St.3d 440, 446, 659 N.E.2d 1242, 1247 (1996). In *Preston*, the Ohio Supreme Court clarified the standard for imposing and assessing punitive damages in Ohio. After reviewing its previous decisions in which punitive damages were awarded, the Court formulated a definition for a finding of actual malice to support an award of punitive damages. In this regard, actual malice is "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a

spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." 32 Ohio St.3d at 336, 512 N.E.2d at 1176.  "[A]ctual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross." *Villella v. Waikem Motors, Inc.*, 45 Ohio St.3d 36, 37, 543 N.E.2d 464, 467 (1989).  However, something more that mere negligence is required. *Preston,* 32 Ohio St.3d at 335, 512 N.E.2d at 1176.  Where, as here, a party bases his claim for punitive damages on the second concept of malice, the Court "must review the evidence to determine if reasonable minds can differ as to whether the party was aware his or her act had a great probability of causing substantial harm." *Preston,* 32 Ohio St.3d at 336, 512 N.E.2d at 1176.  Such great probability "can be likened to high foreseeability." *Calmes v. Goodyear Tire & Rubber Co.*, 61 Ohio St.3d 470, 575 N.E.2d 416, 420 (1991). In addition, the Court must assess whether "sufficient evidence is presented revealing that the party consciously disregarded the injured party's rights or safety." *Preston,* 32 Ohio St.3d at 336, 512 N.E.2d at 1176.

Viewing the evidence in the light most favorable to the plaintiffs, the Court finds that reasonable jurors might disagree on whether Ambassador exhibited a conscious disregard for the rights and safety of Joel Moyer and that such conduct had a great probability of causing substantial harm.  The evidence is not so one-sided in this matter that the jury could reach but one conclusion that there was no "malice" on the part of Ambassador as that term has been defined under Ohio law.  A reasonable jury could conclude that Ambassador consciously disregarded Joel's rights and safety.  As Judge Weber found, Ambassador and its chaperones took custody of the children on the Program.  Under the circumstances of this

7

case, taking custody of minor children implies a heightened duty for the safety and well-being of such children.  Under Ambassador's Program, minor children traveling abroad without their parents are placed in the homes of strangers.  Ambassador's own marketing materials, guidelines, and representatives acknowledged the safety concerns inherent in this situation, and assured parents that their children would be staying in the homes of "carefully selected" host families.  Yet, plaintiffs' evidence shows that Ambassador delegated the duty of selecting host families to a third party, EIL, without any follow up to determine whether its own guidelines were being followed.  In addition, Ambassador failed to disclose this delegation of duty to prospective students and their families, while representing it was indeed responsible for "carefully selecting" host families.   Joel's parents relied on Ambassador's representations that Ambassador carefully selected homestay hosts, and that such hosts consisted of parents with children.

     A reasonable jury could also conclude that Ambassador abdicated its responsibility for the Edinburgh homestay selection to Joel, a minor student participant.  Catherine Ransenberg testified that she knew the placement of Joel with Mr. Carroll, a single male, was not appropriate and not in keeping with Ambassador's guidelines.  She admitted to being "very upset" and "extremely uncomfortable" about Joel's placement with Mr. Carroll, yet left the ultimate decision to stay with Mr. Carroll up to Joel and his roommate.  Under the totality of the circumstances, the decision on the appropriateness of a homestay with Mr. Carroll, a single male without children, was not one that should have been left to a minor student in a foreign country without his parents, especially in view of how that decision unfolded.  It is undisputed that Ransenberg, Ambassador's employee and trip chaperone, did

not learn of Joel's placement with Carroll until they were on the bus en route to Edinburgh. Ransenberg expressed grave reservations about the placement, yet ultimately left the decision to Joel and Dan Kelley, Joel's roommate. While Ambassador argues Joel and Dan Kelley were given the "option" to stay with Mr. Carroll or not, that decision should never have been left to a minor student. Part of the concept of keeping minor children out of harm's way during a homestay was to place them in a situation that would be the most safe. When presented with a situation that Ambassador's representative Ransenberg knew was not in keeping with this concept and leaving the decision to Joel, Ambassador knowingly placed him in a risky situation.

    Moreover, Ambassador's own guidelines require detailed information about homestays 30 days before the departure of a trip. This obviously did not happen since EIL was advertising for homestay hosts less than two weeks before departure and Carroll was not engaged as a homestay host until just one week prior to Joel's Edinburgh arrival. It is reasonable to infer that this policy was in place to enable Ambassador to review the appropriateness of selected homestay hosts by the outside company and to ensure Ambassador's guidelines were followed *before* placement of the students with such homestay hosts. The jury could reasonably conclude that Ambassador's utter failure to follow this guideline under the circumstances of this case was reckless.

    Ambassador cites to evidence that after investigating EIL and obtaining excellent references from a youth travel oversight organization, it determined EIL was a reputable company. Ambassador's representative, Pamela Duckmanton, met with EIL representatives to discuss Ambassador's guidelines in a meeting in Washington. Duckmanton also went to

the United Kingdom in early 1999 for a "look and see" visit, met with EIL representatives, and again explained the homestay guidelines. Plaintiffs' evidence, however, indicates Duckmanton was not aware of the existence of two separate EIL organizations and visited only the EIL representatives in Ireland, but not in England. This evidence, coupled with the above evidence of Ambassador's failure to follow its own guidelines, could lead a reasonable jury to conclude that Ambassador consciously disregarded the rights and safety of Joel Moyer.

To the extent EIL's actions are imputed to Ambassador, Ambassador argues that EIL did not act with a conscious disregard for Joel's safety. Frances Carney, a lifelong Edinburgh resident, and volunteer homestay coordinator for EIL in Edinburgh, personally visited Mr. Carroll's home and, based on her experience and interview, assessed Carroll to be a suitable host. Mrs. Carney testified she had no reservations about Mr. Carroll's suitability as a host and would feel safe placing her own son in Carroll's home. However, Ambassador had no communication with Francis Carney and Mrs. Carney had no knowledge of Ambassador's guidelines on homestays. This fact, in conjunction with Ambassador's failure to follow up on EIL's noncompliance with its guidelines and Ambassador's chaperone allowing the arrangement with Carroll to stand despite her knowledge of the inappropriateness of the arrangement, supports a finding that Ambassador possessed knowledge of the harm that might be caused to Joel by its actions. *Preston,* 32 Ohio St.3d at 335, 512 N.E.2d at 1176.

A reasonable jury could also conclude that Joel faced a great probability of substantial harm from an inappropriate homestay placement. While Ambassador argues it

10

had no knowledge of any past criminal history or criminal propensity on the part of Carroll and that a subsequent criminal investigation resulted in no charges against Carroll, the jury could reasonably infer from Ambassador's guidelines for host families that the risk of substantial harm posed by an inappropriate homestay was highly foreseeable. All the witnesses acknowledged that Ambassador's guidelines for homestay families did not include single males with no children. Placement of students with a single male with no children was not in the possible scenarios presented to prospective families because of a recognition that families were not likely to sign up for the Program had such a possibility been known in advance. (Moore-Chritchlow depo. 55-56). The reasonable inference to be drawn from Ambassador's guidelines specifying that students will stay with host families consisting of a married couple or a single parent with children of comparable age to that of the student is "to protect children from the risk of harm posed by an inappropriate homestay, including the risk of becoming the victim of criminal behavior by a host such as that which allegedly occurred during Joel's homestay with Mr. Carroll." (Doc. 103 at 20). It is reasonable to infer that Ambassador's guideline was created in recognition of this known risk of substantial harm. Given the testimony and other evidence in this case, the jury could reasonably find that Ambassador exercised a conscious disregard for the rights and safety of Joel and that such conduct had a great probability of causing substantial harm. Because reasonable jurors might disagree on the issue of malice, defendant's motion for partial summary judgment on the issue of punitive damages must be denied.[1]

---

[1] Contrary to defendant's argument, Ambassador is not entitled to summary judgment on the basis of plaintiffs' alleged failure to supply evidence that Ambassador acted "willfully" or "wantonly." (Doc. 128 at 3). *Bishop v. Grdina*, 20 Ohio St.3d 26, 485 N.E.2d 705 (1985), cited by defendants in support of this argument, merely "stand[s] for the age-old proposition that proof of actual damages in an underlying cause of action is a necessary

Accordingly, Ambassador's motion for partial summary judgment on count 5 of plaintiffs' third amended complaint (Doc. 120) is hereby **DENIED**.

**IT IS SO ORDERED.**


Date:  8/27/2004                             s/Timothy S. Hogan
                                            Timothy S. Hogan
                                            United States Magistrate Judge

---

predicate for an award of punitive damages." *Moskovitz v. Mt. Sinai Medical Center*, 69 Ohio St.3d 638, 649-50, 635 N.E.2d 331, 342 (1994). At issue in *Bishop* was whether an award of punitive damages is legally supportable where no actual harm is shown in the underlying cause of action. However, there is no requirement that "the malicious conduct giving rise to a claim for punitive damages must independently cause compensable harm before punitive damages may be awarded." *Moskovitz v. Mt. Sinai Medical Center*, 69 Ohio St.3d 638, 651, 635 N.E.2d 331, 343 (1994). If plaintiffs prevail on their negligence and/or loss of consortium claims, and are awarded compensatory damages on either claim, the jury may then determine whether an award of punitive damages is justified by the evidence. *See, e.g., Cabe v. Lunich*, 70 Ohio St.3d 598, 640 N.E.2d 159 (1994)(trial court erred in refusing to submit issue of punitive damages to jury in negligence claim where compensatory damages were awarded and where evidence of drunk driving was sufficient to support finding of recklessness); *Doe v. White*, 97 Ohio App.3d 585, 647 N.E.2d 198 (Montgomery Cty. 1994)(punitive damages awarded in negligence and malpractice action against counselor who after being telephoned by client in fragile mental state, obtained client's address, went to client's home, and engaged in sexual intercourse with client).